[No. S014199. July 20, 1995.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY HAWKINS, Defendant and Appellant.

COUNSEL

Michael B. McPartland, under appointment by the Supreme Court, and Carl A. Gonser for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, William G. Prahl, Raymond L. Brosterhous and Janine R. Busch, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MOSK, J.—Defendant Jeffrey Hawkins was found guilty by a jury of two counts of first degree murder, as well as one count each of robbery and attempted murder. The jury also found true two special circumstances—felony murder (Pen. Code, § 190.2, subd. (a)(17)(i))[1] for a murder committed in the course of a robbery, and multiple murder (§ 190.2, subd. (a)(3)). After the first jury deadlocked as to the penalty phase, a second jury fixed the penalty at death. The trial court sentenced defendant to death. This appeal is automatic under section 1239, subdivision (b).

We affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

At the guilt phase the prosecution presented evidence that defendant was responsible for two murders in separate incidents, one of which also involved robbery and attempted murder. Each of these incidents will be discussed in turn.

[1] All statutory references are to the Penal Code unless otherwise indicated.

### 1. *The Hedlund Murder*

The prosecution introduced evidence tying defendant to the murder of John Hedlund. Hedlund was last seen alive on the night of March 3, 1987, at a bar called the Uptown Saloon in Galt, a town in southern Sacramento County. Hedlund had been a regular customer at that establishment. The bartender at the Uptown Saloon, Connie Sue Trottie, and a customer, Jill Gibbs, identified defendant as present at the saloon, playing pool with Hedlund on the night in question. Defendant, who at the time was living nearby at his uncle's house, had apparently frequented that bar for several weeks before March 3. According to Gibbs, defendant had left the bar around midnight, a few minutes after Hedlund's departure. Hedlund had left behind a half-finished pitcher of beer and a pack of cigarettes, which according to Trottie was unusual for him. Hedlund's automobile was parked outside the bar but, according to one of the bar patrons who had done mechanical work on the automobile, its engine was in disrepair and it was inoperable.

Hedlund was found dead at 8 a.m. on the morning of March 4 in a ditch in an open field some three miles east of Galt. His body was wrapped in a bloodstained horse blanket on which were found traces of horsehair, bird feathers, and bird feces as well as some vegetation debris, possibly straw. His pants were unzipped and lowered down to the midthighs. Several beer cans were found in the vicinity of the body. One witness who lived nearby testified that he had heard no gunshots and that his dogs, who usually barked at loud noises, had not barked that night. The coroner determined that the cause of Hedlund's death was two gunshot wounds to the back of the neck and base of the head, one of which was fired at a range of less than a foot. The body also had minor abrasions on the forehead, nose, chin and left thigh, and a seven-and-a-half-inch abrasion along the front part of the neck that was consistent with a fingernail gouge. Subsequently, ballistics experts determined that a projectile removed from the body was fired from the same gun used to murder Herman Hicks, a crime to which defendant was tied by eyewitness evidence, as will be discussed below. The prosecution argued that the position of the entry wounds and the close range at which they were inflicted strongly implied a deliberate "execution" style killing. The prosecution also pointed to the numerous bullet fragments found in Hedlund's head and neck, suggesting the murderer's use of particularly lethal "hollow point" bullets that tend to explode and diffuse on impact.

The other piece of evidence linking defendant with the Hedlund murder was that defendant had stayed for some time the previous month at the home of Carmen Greenfield, a woman who raised horses and various rare birds on

a ranch outside of Galt. The blanket with traces of horsehair and bird feathers could have come from Greenfield's ranch, although the origin of the blanket was never established with certainty.

Defendant presented evidence from some of those present at the bar on March 3, 1987, calling into question whether Gibbs, the one witness who had reported that Hedlund and defendant had left the bar around the same time, had herself been present at the bar that night. Defendant further pointed to the fact that Gibbs had testified that he and Hedlund had left from separate entrances as evidence that they had not met up with each other after they left the bar. He also introduced into evidence articles by a criminalist raising questions as to the scientific exactitude of ballistics identification evidence.

### 2. *The Hicks Murder*

Jerry Stevens, manager of Sonny's Market in Rancho Cordova outside of Sacramento, identified defendant as the man who had robbed the store while Stevens worked at the market on March 10, 1987, about 7:50 a.m., and who shot him and fatally shot one of the store's customers, Herman Hicks. According to Stevens's testimony, defendant walked up to the checkout counter of the store with a can of beer. The store was empty but for Stevens, defendant, and Hicks. Defendant drew a handgun on Stevens and told him to empty the cash register and put the money in the paper bag containing the beer. He testified to a deliberate effort to closely scrutinize the robber as a means of later identifying and apprehending him. Defendant told Stevens not to look at him, and then instructed him to get down on his knees behind the counter. Defendant shot Stevens in the right side of the chest, with the bullet exiting from his armpit beneath his right shoulder. He fell to the floor and lay still, as though dead. While lying on the floor he heard two more gunshots, neither directed at him.

Shortly thereafter, Stevens arose from behind the counter. Defendant had fled the store. Hicks lay on the floor in a pool of blood: he died from a single gunshot wound to the head, most likely fired from two to three feet away. Robert Johnson, another customer, entered the store at approximately the same time defendant was leaving. Stevens, fearing a loss of consciousness or death, had Johnson write down Stevens's description of his assailant: a white male between 32 and 35 years of age, 5 feet 10 inches tall, weighing approximately 170 pounds, a gold stud in his left ear, and a tattoo of a skull or a rounded figure on his neck. Stevens later made a positive identification of defendant in a police lineup, as well as identifying him in a photographic lineup. Johnson was apparently not initially contacted by police, but identified defendant in a photographic lineup two years later, the day before he testified at trial.

Defendant had been stopped earlier that morning, around 5:25 a.m., in downtown Sacramento, and had been cited by the Sacramento police for driving the wrong way down a one-way street. He was in possession of the driver's license of one Malcolm Centers, who apparently resembled him, but it was stipulated that it had indeed been he who had been stopped and cited that morning. The driving time between the place where he was cited and Sonny's Market is approximately 15 minutes. The automobile he was driving was registered in the name of Katherine Taylor, who was identified as having been his girlfriend or ex-girlfriend at that time. The description of the automobile by the officer who issued the citation was somewhat at variance with that of Johnson's description of the vehicle driven from Sonny's Market.

Defendant was apprehended on March 16, six days after the Hicks murder in Corona, in Riverside County, where his brother, father, and stepmother resided. The day of his arrest, he assaulted his brother, Gerald Hawkins (hereafter sometimes Gerald), a homeless resident living in the Corona area. According to a statement taken from Gerald shortly after the assault, and reiterated approximately 10 days later in a tape recording introduced in evidence, defendant met Gerald on a street in Norco outside Corona, and they spent a number of hours drinking and talking together. Defendant told Gerald that he had shot a store clerk and a "black guy" during a robbery when he was up north, and that he was "looking at death row." Hicks was a Black man. Defendant further told Gerald that one of the witnesses to the murder survived and that he was thinking of going back to Sacramento County to "take care" of that person. Gerald apparently advised defendant against this course of action and an argument broke out between them. Shortly thereafter, Gerald went to use the restroom of a nearby filling station, and upon exiting was attacked by defendant with a small knife and seriously injured. The police were called to the scene and took Gerald's statement incriminating defendant. Police apprehended defendant that same day.

Defendant challenged the reliability of the eyewitness identifications, pointing to the discrepancy between Stevens's initial description of his assailant and his actual appearance: he is five feet seven inches rather than five feet ten inches; he assertedly did not have long hair at the time and did not wear a gold stud on his ear—facts that were disputed at trial; the description of the tattoo on his neck was also assertedly inaccurate. Defendant pointed as well to Johnson's initial profession of inability to identify the robber when questioned by police shortly after the Hicks murder occurred as evidence of the unreliability of Johnson's eyewitness testimony. Further, he introduced the testimony of a psychologist who called into question the general reliability of much eyewitness testimony.

Moreover, defendant attempted to impeach the testimony of his brother Gerald with his prior inconsistent statements. Gerald had denied at the preliminary hearing in October of 1987 the truth of his earlier statements to the police regarding defendant's admission of the murder of a Black man and attempted murder of a store clerk, although he again reversed himself at trial and attested to the truth of his earlier tape-recorded testimony. Defendant also sought to impeach Gerald by showing that the latter, as a homeless man and alcoholic with a long-term addiction to inhaling paint fumes, could not be relied on for accurate testimony. He himself did not take the stand.

## B. *The Penalty Phase*

Defendant stipulated to eight prior felony convictions arising out of six separate incidents: robbery in 1974; unauthorized use of a vehicle (Veh. Code, § 10851) in 1976; assault with a deadly weapon in 1978; battery with serious bodily injury in 1980; two counts of possession of a firearm by a previously convicted felon in 1981; and one count each of assault with a deadly weapon on a police officer and unauthorized use of a vehicle in 1983.

The prosecution also introduced evidence of uncharged crimes: a 1974 incident, in which defendant allegedly resisted arrest for robbery and struck a police officer; a 1980 incident, in which a convicted drug dealer testified that he was beaten by defendant and three other people, and then shot by defendant, during a drug transaction; a 1981 incident in which he allegedly resisted arrest and fought with a police officer over the surrender of his firearm; the 1987 assault on his brother shortly before he was arrested; and a 1989 incident in the Sacramento County jail where he resided during trial, in which he allegedly drank contraband alcohol, joined other inmates in clogging up the toilet, and threatened the lives of the guards attempting to restore order.

The circumstances of the Hicks offense were also presented in some detail. Evidence of the Hedlund murder, other than the fact of conviction itself, was not introduced, with one exception: forensic evidence regarding the condition of Hedlund's body when it was discovered shortly after his murder was presented to show that the murder had been committed in an execution style.

Defendant for his part claimed in mitigation that his violent acts were attributable to his own violent upbringing. His mother testified that his father was frequently drunk, and would beat her when in this condition. She also testified that she was sent to federal prison for cashing a stolen check when defendant was four years old, and he was sent off to foster homes and

thereafter to his father. Defendant's father testified that he himself had a history of mental instability that caused him to attempt suicide while in the Army and to spend some time in a mental institution. He further testified that he regularly hit defendant, that he had used firearms in the house in defendant's presence, and that he had neglected the care of his children. He also stated that he sometimes had locked defendant in the house, the basement or the closet in order to prevent defendant from running away. Defendant's grandmother also testified to his difficult childhood. His uncle testified that he had not received proper care, that his mother had been a frequent drug user, and that his parents generally neglected him. Defendant introduced evidence showing that the abuse and neglect visited on him and his two brothers had taken a serious toll on each of them: defendant became a career criminal; his brother Gerald became a homeless alcoholic and substance abuser and his other brother, Danny, had attempted suicide and was eventually killed in a boating accident caused by his father's intoxication.

There was also a stipulation that in 1966 defendant fell out of a tree and possibly sustained a concussion. No evidence was presented as to the long-term effect of such an injury. Defendant did not testify in his own behalf.

## II. GUILT PHASE CONTENTIONS

### A. Denial of "For-Cause" Challenges to Prospective Jurors

Defendant claims that his challenges to two potential jurors for cause during voir dire were wrongfully denied. The denial of these challenges, defendant contends, led to the seating of Ronald Creighton, a retired state trooper who, defendant asserts for the first time on appeal, was biased against him. He argues that the denial of these for-cause challenges led to the seating of a biased jury in violation of defendant's rights under the Sixth Amendment of the United States Constitution and its counterpart in the California Constitution. But even assuming arguendo that the for-cause challenges were wrongly denied, defendant can show no violation of defendant's Sixth Amendment rights and therefore no prejudicial error.

Defendant argues specifically that, because of the denial of the two for-cause challenges, he was forced to exercise one of his remaining peremptory challenges to remove prospective juror Major, who was clearly biased against him, and was further compelled to reserve his last remaining peremptory challenge in the final round of voir dire for prospective juror Smith, also biased. This led to the seating of Creighton, whom he claims he would have

removed with a peremptory challenge had he not had to expend or reserve these peremptories to keep Major and Smith off the jury. Defendant concedes, however, that Creighton was not challengeable for cause because of his unabashed profession of willingness to put aside his personal feelings in favor of the prosecution and to follow the law. It is well settled that even if the trial court erred in denying a defendant's motion to remove a juror for cause, that error will be considered harmless if "[n]one of the prospective jurors whom defendant found objectionable actually sat on his jury." (*People v. Gordon* (1990) 50 Cal.3d 1223, 1247 [270 Cal.Rptr. 451, 792 P.2d 251]; see also *Ross* v. *Oklahoma* (1988) 487 U.S. 81, 86 [101 L.Ed.2d 80, 88-89, 108 S.Ct. 2273].) "[W]e reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." (*Ross, supra,* 487 U.S. at p. 88 [101 L.Ed.2d at p. 90].) In this case, none of the jurors that were challenged for cause actually sat on the jury. Moreover, defendant did not communicate to the trial court any dissatisfaction with the jury selected. (See *People* v. *Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People* v. *Morris* (1991) 53 Cal.3d 152, 184 [279 Cal.Rptr. 720, 807 P.2d 949].)

Therefore, defendant's right to an impartial jury was not violated, and any error by the trial court in denying defendant's motion to excuse veniremen Major and Smith for cause, if error there was, was not prejudicial.

B. *Severance of the Hedlund Murder*

 Defendant made no motion to sever count 4, the Hedlund murder, from the first three counts of murder, robbery, and attempted murder at Sonny's Market (the Sonny's Market counts) with which he was charged. He now contends that the trial court erred in failing, sua sponte, to sever his trial on the Hedlund murder, and that this error violated his right to due process and a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and analogous provisions of the California Constitution. He contends that the trial court also erred in failing to instruct the jury that evidence from the Sonny's Market counts could only be used in a limited fashion to determine defendant's guilt in the Hedlund murder. Finally, he contends he received ineffective assistance of counsel under the United States and California Constitutions, both in his attorneys' failure to make a motion for severance and in their failure to request the proper limiting instruction. As will appear, none of defendant's claims have merit.

1. *Failure to Sever*

Joinder and severance of different criminal counts against the same defendant are governed by section 954, which states that an "accusatory pleading

may charge two or more different offenses connected together in their commission . . . of the same class of crimes or offenses . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." ▮ The severance provisions of section 954 reflect "an apparent legislative recognition that severance may be necessary in some cases to satisfy the overriding constitutional guaranty of due process to ensure defendants a fair trial." (*People* v. *Bean* (1988) 46 Cal.3d 919, 935 [251 Cal.Rptr. 467, 760 P.2d 996].)

▮ Section 954, however, imposes no sua sponte duty of severance on trial courts. That section, as quoted above, requires the defendant to make a showing of "good cause" in order to obtain severance, and defendant's failure to request a severance waives the matter on appeal. Nor do we find any authority to support defendant's argument that the Fifth, Sixth, Eighth or Fourteenth Amendments of the United States Constitution, or their California counterparts, impose such a duty.

This leaves the question whether defendant suffered an impairment of his Sixth Amendment right to effective assistance of counsel due to his attorneys' failure to make a motion for severance. ▮ To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-694 [80 L.Ed.2d 674, 693-698, 104 S.Ct. 2052]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216-218 [233 Cal.Rptr. 404, 729 P.2d 839].) ▮ As will appear, defendant cannot show in this instance a reasonable probability that, had trial counsel made the motion for severance, a more favorable verdict would have resulted.

Defendant argues that a motion to sever, had it been made, should have been granted because the joinder of the Hedlund murder with the Sonny's Market counts unfairly prejudiced him due to the relative weakness of the evidence in the former case. Whereas the case against him in the Sonny's Market counts was supported by the testimony of two eyewitnesses identifying defendant at the crime scene, the Hedlund murder depended, defendant contends, on relatively inconclusive circumstantial evidence—chiefly ballistics identification evidence and testimony that Hedlund and defendant left a bar at about the same time on the night of the murder. The fact that the jury knew from the Sonny's Market crime that defendant was capable of extreme

violence, he argues, would unfairly predispose it to decide the Hedlund murder count against him.

 "A ruling on a motion to sever is based on a weighing of the probative value of any cross-admissible evidence against the prejudicial effect of evidence the jury would not otherwise hear, but in the weighing process the beneficial results of joinder are added to the probative value side." (*People* v. *Bean, supra,* 46 Cal.3d at p. 936.) In this case, the trial court would certainly not have abused its discretion by denying a motion to sever. Evidence of the Sonny's Market counts would have been not only admissible at, but critical to, a separate Hedlund murder trial. The essentially unrebutted testimony of two ballistics experts linked the gun used to murder Hicks at Sonny's Market with the gun used to murder Hedlund six days earlier. It was therefore more than probable that a substantial portion of the evidence of the Sonny's Market counts, including Jerry Stevens's highly incriminating eyewitness testimony, would have been admitted at a separate Hedlund murder trial to prove defendant's possession of the Hedlund murder weapon six days after that murder occurred. (See *People* v. *Johnson* (1988) 47 Cal.3d 576, 587-591 [253 Cal.Rptr. 710, 764 P.2d 1087] [separate incidents of murder and rape tried together and motion for severance denied where rape victim identified defendant as the rapist, and where a handgun and cartridges believed to be taken from the murder scene were present at the scene of the rape].)

Because much of the incriminating evidence in the Sonny's Market counts would have been used in a separate Hedlund murder trial to prove the identity of the murderer, the trial court would not have abused its discretion by refusing to grant a motion to sever had such a motion been made. We therefore have no basis for concluding there was a reasonable probability that a motion for severance would have been granted. Ipso facto, we cannot conclude there was a reasonable probability that counsel's request for severance would have resulted in a verdict more favorable to defendant.[2] Defendant's ineffective assistance of counsel claim is therefore without merit.

---

[2]Defendant also argues that, had the trial been severed, he might have been able to sanitize the evidence of the Sonny's Market counts to minimize the prejudice to him in the trial of the Hedlund murder. Such a speculative claim makes defendant's *post hoc* argument for severance no more meritorious. Had the trial been severed, in the Hedlund murder trial defendant would have faced serious practical problems in attempting to limit the eyewitness testimony identifying him as the one who fired the gun at Sonny's Market. The availability of this "sanitization" argument, therefore, does not alter our conclusion that there was no reasonable probability that a motion for severance would have been granted, and therefore no reasonable probability that the making of such a motion would have affected the verdict in defendant's favor.

### 2. *Failure to Give Limiting Instruction*

■ Defendant also contends that the trial court failed in its duty to provide sua sponte an instruction limiting the jury's consideration of the Sonny's Market crimes in deciding the Hedlund murder. But we have held that the trial court has no such duty to provide limiting instructions regarding evidence of past criminal conduct, either of uncharged criminal activity or of prior convictions. (*People* v. *Milner* (1988) 45 Cal.3d 227, 251-252 [246 Cal.Rptr. 713, 753 P.2d 669].) Similarly, the trial court does not have the sua sponte duty to furnish a limiting instruction on cross-admissible evidence in a trial of multiple crimes.

We also reject defendant's contention that his defense counsel's failure to request a limiting instruction on the cross-admissible evidence in this case constituted ineffective assistance of counsel. A reasonable defense counsel may have concluded that the risks of issuing a limiting instruction—the risk, for example, that such an instruction may suggest to the jury that the evidence supporting the Sonny's Market counts was relatively strong—was not worth the questionable benefits such instruction would provide. (Cf. *People* v. *Freeman* (1994) 8 Cal.4th 450, 495 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

Defendant further faults the trial court for failing to adequately respond to an inquiry from the jury regarding the use of the evidence in the Sonny's Market counts in deciding the Hedlund murder count. After the jury had found the defendant guilty on the Sonny's Market counts, but had not yet resolved the Hedlund murder count, the jury made the following written request to the court: "We, the jury in the above entitled action, request the following: One juror needs to know if we can consider evidence from Counts 1, 2, 3 in with the evidence from Count # 4. . . . [¶] This is in regards to our Count 4 decision. [¶] This juror heard the judge admonish us that we were now to forget Counts 1, 2, 3."

In open court, and in the presence of counsel, the trial judge responded to the jury's inquiry as follows: "Very simple to answer in words of one syllable. You may consider all evidence that you had on the case on any consideration. I pulled yesterday's proceedings to see what it was that sounded like I was telling you to forget it, and the only thing I come to is this . . . , whereafter having taken verdicts that you completed as to three counts, I said: [¶] 'Very well. Those three verdicts have been read into the record . . . . We had those verdicts, and you needn't give those matters . . . further consideration.' [¶] So I said you need not give them further consideration. I simply meant we took the forms off your hands relieving [the jury

foreman's] concern about security of forms. That in no sense restricts you. I am not trying to carve out anything of evidence that you are no longer to consider. The evidence is all before you for whatever singular or cumulative, direct or circumstantial value it may have."

The trial court's statement is, understood in its proper context, correct. The statement was intended to correct the specific misapprehension of one of the jurors, who believed he had heard the judge admonish the jurors "to forget about counts one, two and three." Since, as discussed above, there was evidence presented in the first three counts relevant to the Hedlund murder, it was proper to instruct the jury that such relevant evidence was appropriately considered.

Defendant contends that the trial court's comments were overbroad and could have misled the jury to believe that it could use the fact of his culpability for the Sonny's Market counts as character evidence in deciding the Hedlund murder count. We disagree that the trial court's remarks, taken in context, were susceptible to this misunderstanding. Further, defendant's failure to request a clarification of the trial court's statement waives the issue on appeal. (See *People* v. *Terry* (1970) 2 Cal.3d 362, 398 [85 Cal.Rptr. 409, 466 P.2d 961].) And because the trial court's comment to the jury was reasonably clear, counsel's failure to request such clarification does not constitute ineffective assistance.

### C. *Shackling Defendant*

At the outset of defendant's trial, the sheriff's office requested defendant be seated during trial in a security chair, which restrains a person around the waist in a manner not directly visible to the jury. According to the court security supervisor, Sergeant Beers, defendant had been involved in three fistfights at the Sacramento County jail between July of 1987 and the date of Beers's testimony on January 27, 1989. Defendant had also had a syringe discovered in his cell. These incidents, together with the defendant's history of criminal violence, and the general policy of the sheriff's department of shackling capital defendants, led the sheriff to recommend that defendant be restrained. The court agreed and ordered the restraint. Defendant now contends that this shackling was prejudicial error. We disagree.

We have held that "a defendant cannot be subjected to physical restraints of any kind in the courtroom while in the jury's presence, unless there is a showing of a manifest need for such restraints." (*People* v. *Duran* (1976) 16 Cal.3d 282, 290-291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1].)

"The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Id.* at p. 291.) A reviewing court will uphold the decision of the trial court to shackle a defendant, however, absent an abuse of discretion. (*People* v. *Pride* (1992) 3 Cal.4th 195, 231-232 [10 Cal.Rptr.2d 636, 833 P.2d 643].)

We agree with defendant that his record of violence, or the fact that he is a capital defendant, cannot alone justify his shackling. (*People* v. *Duran*, *supra*, 16 Cal.3d at p. 293.) But in this case, defendant's three reported fistfights in prison, together with his extensive criminal history, are sufficient to support the trial court's order to shackle defendant, inasmuch as they demonstrate instances of "violence or nonconforming conduct" while in custody. The trial court was therefore within its discretion to order the shackling of defendant.

Defendant argues that three fistfights in jail after being housed there for one and one-half years is "not unusual" and was insufficient to justify the shackling. He claims rather that shackling is justified only when a defendant has attempted to disrupt courtroom proceedings or to escape from jail, citing as example *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 95-96 [270 Cal.Rptr. 817, 793 P.2d 23]. We have never placed such preconditions on the trial court's exercise of its discretion. When, as in this case, there were multiple instances of violent and nonconforming behavior while in jail, as well as an extensive background of criminal and violent activity, we will generally not second-guess the trial court's decision to restrain a defendant.

### D. *Failure to Grant Continuance*

■ On February 27, 1989, during the jury selection process, defendant appeared in court with numerous abrasions and bruises on his face, and with a swollen and bandaged right eye. Apparently, he had gotten into a fight with prison guards the previous day after consuming unlawfully obtained alcohol, stopping up a toilet, and refusing to vacate his cell after the guards ordered him to do so. He requested a continuance on the grounds that cuts and abrasions on his face, obviously the result of a fight, would dispose the prospective jurors to view him as prone to violence. The trial court granted a two-day continuance. After the two days, defendant requested an additional one-week continuance. The trial court noted that the cuts and abrasions on defendant's face were hardly noticeable, except for his blackened right eye, which was showing a greater sign of discoloration than previously. The court also informed counsel that it would admonish the jury to disregard the black eye if so requested, and that it was less inclined to grant the

additional continuance because defendant's injuries were apparently the result of his own provocation. Defendant now claims that the trial court's failure to grant the continuance was prejudicial error, implicating various federal constitutional guaranties. The claim is without merit.

"The granting or denial of a continuance during trial traditionally rests within the sound discretion of the trial judge." (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1171 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) Here, the trial court determined that defendant's appearance would not likely result in prejudice and that whatever prejudice might occur would be curable through admonition. The trial court also implicitly determined that the minor detriment to defendant in appearing before the jury panel was outweighed in this instance by the need to proceed expeditiously with his trial. We cannot say the trial court abused its discretion by denying the second motion for a continuance. Nor is defendant able to demonstrate that, had the one-week continuance been granted, there is a reasonable probability that the outcome of the trial would have been more favorable to him.[3] We further find that none of defendant's federal constitutional rights were violated from this failure to grant the continuance.

### E. *Trial Court's Comments on Ballistics Evidence*

Defendant contends that the trial court improperly expressed its opinion as to the reliability of the testimony of an expert ballistics witness for the prosecution, and then erroneously denied defendant's motion made the following day to strike those comments. He claims that such improper comment violated his right to due process, to confront witnesses, and to be tried by a jury under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and analogous state constitutional provisions. Defendant's claim is procedurally barred, because he failed to make these constitutional objections below. (See *People* v. *Benson* (1990) 52 Cal.3d 754, 788 [276 Cal.Rptr. 827, 802 P.2d 330].) Defendant's claim also fails on the merits because we find that the trial court did not err in its questions and comments regarding the ballistics testimony.

---

[3]Defendant raises on appeal for the first time that he was deprived of due process because he was placed on medication, presumably in connection with the injuries resulting from the incident discussed above, and the effects of the medication may have impaired his ability to assist in his own defense. At trial, there was only a passing reference by defense counsel to the fact that defendant was on medication. There is no evidence in the record before us that the medication was used throughout the trial, or that it actually impaired defendant's ability to think or concentrate. Therefore, inasmuch as defendant seeks to base his claim of error for failing to grant his second request for a continuance on the fact that he was medicated and unable to function at the time the continuance was requested, we must reject the claim as without evidentiary basis.

According to the testimony of two qualified ballistics experts, the bullet fragments found in Hedlund's body were fired from the same gun as the fragments recovered from the Sonny's Market crime scene. These experts explained that the copper jackets of the respective bullets were examined under a microscope to compare the striations or lines imprinted on the jackets. The striations are produced when the bullet is fired, and thus reflect the unique characteristics of each gun barrel. The experts compared the number and configuration of matching and nonmatching lines in the two jackets to determine that they were fired from the same gun. They conceded that ballistics identification is not an exact science. Rather, ballistics experts develop proficiency by microscopically observing a large number of bullets known to have been fired from the same gun, and from different guns, so that they acquire knowledge of when the similarities of the bullets' striations are sufficient to establish that the bullets were discharged from the same firearm.

In rebuttal, defendant did not call his own ballistics expert, but rather introduced two scholarly articles by Alfred Biasotti, written in 1955 and 1964, that called for reforming the practice of ballistics identification so as to make it make more precise. According to these articles, criminalists should aspire to a greater quantification of ballistics identifications practice by developing a statistical data base that would inform them of identification thresholds, i.e., the exact number of matching consecutive or proximate striations that would be necessary for the expert to draw the conclusion that the bullets were fired from the same gun. Such a data base would enable criminalists to formulate their opinions on firearm identification in terms of statistical probabilities.

Defendant contends that the trial court erred in the manner in which it intervened in the interrogation of the senior ballistics expert, Robert Garbutt, to question him about the significance of Biasotti's work. Garbutt both reviewed the work of the other ballistics expert, Eric Parsons, and independently examined the bullet fragments, concluding that they were both fired from the same gun. On cross-examination, defense counsel questioned Garbutt, as he had Parsons, about Biasotti's views. That cross-examination attempted to establish the lack of scientific precision in the methods of ballistics identification. Garbutt conceded that ballistics identification was to some extent more of a skill than a science, an intuition informed by extensive experience. After the prosecution's redirect examination, and defendant's recross-examination, the trial court further interrogated Garbutt. The court prefaced its remarks by making an analogy between ballistics and psychiatry, stating in essence that Sigmund Freud's lack of a Diagnostic Statistical Manual, a work currently used to secure uniformity in psychiatric

diagnoses, did not invalidate his work as a psychiatrist. The court then asked Garbutt if his ballistic identification in this case "was weakened any degree by having been reminded today of Mr. Biasotti's concerns about how a statistical model might lend an even additional dimension to your field?" Garbutt responded by stating that his opinion "is not diminished and is as strong. Biasotti's article is part of my training and learning, and I do consider his work in part in forming the opinion which I have formed."

After Garbutt elaborated on this statement, the trial court then stated: "Fifteen or twenty years ago [a] U.S. Supreme Court justice got some recognition about making a statement about obscenity. I don't know how to define it, but I know it when I see it. Is that analogous to what we are saying here: that you can't give us an objective definition of something, but you still have some confidence [in] what you have seen, that you have seen enough data to come to an opinion?" Garbutt replied in the affirmative.

The following day, defendant objected to the trial court's interrogation and comment and asked for a motion to strike on the grounds that "the Court abused his discretion and became an advocate in asking those questions in trying, basically to do [the prosecutor's] job and to make Mr. Garbutt's testimony more credible." The court denied the motion. Defendant now contends that the trial court committed prejudicial error in its interrogation of Garbutt.

■ Article VI, section 10 of the California Constitution states in pertinent part: "The court may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." Moreover, Evidence Code section 775 permits the court, "on its own motion or on the motion of any party, [to] call witnesses and interrogate them the same as if they had been produced by a party to the action." Inherent within Evidence Code section 775, then, is the judge's authority to interrogate witnesses called by the parties. The authority conferred on the trial court by Evidence Code section 775 to question witnesses sua sponte therefore extends beyond the rather narrow judicial role set forth in Evidence Code section 765, subdivision (a), which declares that the court "shall exercise reasonable control over the mode of interrogation of a witness so as to make such interrogation as rapid, as distinct, and as effective for the ascertainment of the truth, as may be, and to protect the witness from undue harassment or embarrassment."

We have elaborated on the purposes and limitations of the trial court's interrogation of witnesses in *People* v. *Carlucci* (1979) 23 Cal.3d 249 [152 Cal.Rptr. 439, 590 P.2d 15]. Evidence Code section 775, which is a

codification of case law, " 'confers upon the trial judge the power, discretion and affirmative duty . . . [to] participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.' " (23 Cal.3d at p. 256, quoting Gitelson, *A Trial Judge's Credo* (1966) 7 Santa Clara L.Rev. 13-14.)

The constraints on the trial judge's questioning of witnesses in the presence of a jury are akin to the limitations on the court's role as commentator. The trial judge's interrogation "must be . . . temperate, nonargumentative, and scrupulously fair. The trial court may not . . . withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power." (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 766 [230 Cal.Rptr. 667, 726 P.2d 113].)

In the present case, the trial court's questions and comments were within the bounds of propriety. Its role was one of clarification rather than advocacy, aimed at elucidating Garbutt's testimony that the lack of a statistical model did not undermine his confidence in his judgment that the bullet fragments in question were fired from the same gun. If the court expressed any opinion, it was not as to the ultimate question of whether the firearms identification in this case was reliable, but rather that the Biasotti articles did not in themselves undermine that reliability. The expression of this opinion is nothing more than a "comment on the evidence and the testimony and credibility of [a] witness" designed to assist the proper determination of the cause, as permitted by article VI, section 10 of the California Constitution. Therefore, whether the trial court's questioning of Garbutt is viewed as the interrogation of a witness, or a comment on the evidence, or a combination of both, it was part of the trial court's legitimate role of clarifying witness testimony and assisting the jury's understanding of the evidence, and was not error.

F. *Failure to Object to Eyewitness Testimony*

Defendant contends that he received ineffective assistance of counsel when his attorneys failed to object to the admission of "tainted" identification testimony. We find there was no reason to exclude the testimony in question, and therefore defendant's contention fails.

Defendant claims specifically that the testimony of Robert Johnson, the man who entered Sonny's Market moments after the murder of Hicks, and

who identified defendant in the courtroom as the perpetrator, should not have been admitted because: (1) Johnson told police at the time of the crimes that he was unable to identify the robber; (2) Johnson did not testify at the preliminary hearing; and (3) Johnson was shown a series of 22 photographs the day before trial, one of which was defendant's, and these photographs were improperly used to prompt Johnson to identify defendant at trial. None of these are valid grounds for excluding Johnson's testimony. While a jury may have chosen to give less weight to this testimony because of Johnson's initial difficulty in identifying the perpetrator, such hesitancy was no reason to exclude the evidence. Nor was Johnson's viewing of a series of photographs the day before trial reason for exclusion.

Defendant relies on *People* v. *Nation* (1980) 26 Cal.3d 169 [161 Cal.Rptr. 299, 604 P.2d 1051] in support of his claim. In that case, we found ineffective assistance of counsel for failure to object to highly questionable eyewitness testimony regarding the identity of a perpetrator of a lewd and lascivious act. In one instance, three of the witnesses were permitted to confer and come to an agreement concerning which of several mugshots was that of the perpetrator. They did not independently identify defendant and were unable to identify defendant in a subsequent police lineup. (*Id.* at p. 180.) Another witness was initially given a single photograph of defendant and asked if he was the man the witness had seen near the crime scene on the evening in question. These "impermissibly suggestive" procedures would likely have led to the exclusion of this identification evidence had a timely objection been made, and failure to make such an objection constituted ineffective assistance of counsel. (*Id.* at p. 181.)

In the present case, no such comparable police or prosecutorial practices tainted Johnson's identification evidence. In fact, Johnson did provide police with a description of the man he had seen leaving Sonny's Market. Johnson merely informed police at the time that he was "unsure" he could identify the man fleeing Sonny's Market, due in part to his being in a state of shock. There is, moreover, no evidence that Johnson's failure to testify at the preliminary hearing was owing to his inability to identify defendant.

Nor was the showing of photographs to Johnson the day before his testimony an "impermissibly suggestive" practice. Johnson was shown 22 photographs and made a positive identification of the photograph of defendant as the man who had fled Sonny's Market on the day of the crime. He also selected another photograph that he said bore some similarities to the Sonny's Market perpetrator, but he did not identify the person in that photograph as the perpetrator. Although defendant argued at trial, and argues now, that Johnson's ability to identify him was the result of viewing his

picture in television and newspaper accounts of his arrest, Johnson specifically denied that he had seen any such pictures. It was properly the jury's function to weigh the credibility of Johnson's identification evidence, and the trial court instructed the jury extensively on the factors to consider in evaluating the reliability of eyewitness testimony. The admission of such evidence, even if a timely objection had been made, was not error.

We therefore find no ineffective assistance of counsel in the failure to object to Johnson's testimony.

## G. Admission of Evidence of Uncharged Crime

 Defendant contends that the trial court erred in admitting, over his objection, testimony from his brother Gerald regarding the knife attack against him. As recounted above, Gerald testified that he was approached by defendant on March 16, 1987, and the two of them spent the day together getting drunk. Defendant told Gerald that he had committed a murder in the course of robbing a grocery store. Defendant also told his brother that he was going to hitchhike back to Sacramento to "take care of" the eyewitness to the Hicks murder—presumably referring to Jerry Stevens. Gerald attempted to dissuade defendant from this course of conduct. After returning from the rest room of a gas station near where the two had been drinking, Gerald was attacked by defendant, who stabbed him in the side of the throat with a knife and seriously injured him. After stabbing Gerald, defendant departed before the arrival of the police officers called to the scene. Gerald repeated for the police officers defendant's admission of the murder and robbery in Sacramento.

Defendant now contends that evidence regarding his attack on Gerald, as a prior uncharged crime, should have been excluded under Evidence Code sections 1101 and 352 because it was impermissible evidence of his character and his propensity to commit acts of violence, and because whatever probative value it had was outweighed by its highly prejudicial nature. He claims that the trial court erred in permitting this testimony over defendant's objection,[4] and that such error violated his right to due process and a fair trial under various provisions of the United States and California Constitutions, requiring reversal of one or both of his first degree murder convictions. We disagree that the admission of this testimony was error.

---

[4]The People argue that defendant failed to make a timely objection, and that reference to the knife fight had already been introduced into evidence before the objection was made. However, the record reveals a single passing reference by Gerald during cross-examination to the fact that he was mad at his brother at the time he talked to the police because "your brother just don't stick you in the throat, you know what I'm saying." It was when the prosecutor showed his intention to elicit from Gerald the circumstances of defendant's assault against him that defense counsel objected. Although the objection was overruled before defendant stated the basis for the objection, it appears from the context that it was made on

To understand the probative significance of Gerald's testimony regarding defendant's assault, the testimony must be taken in its proper context. Gerald admitted at trial that during the preliminary hearing he had denied that defendant had told him about the robbery and murder. This testimony squarely contradicted the earlier statements he had given police. He attributed this discrepancy in his testimony to the fact that he had been in the same jail as defendant at the time of the preliminary hearing, having been arrested for matters unrelated to the present case, and was afraid of the repercussions if defendant and other prisoners had learned that he had become a "snitch."

On cross-examination, defense counsel sought to emphasize this inconsistency between Gerald's current testimony and his testimony at the preliminary hearing as a means of undermining his credibility. On redirect examination, the prosecutor attempted to bring to light the precise circumstances of the argument between Gerald and defendant leading to Gerald's statement to the police, including defendant's assault against Gerald. It is evident that the prosecution did so to lend credence to Gerald's testimony that he had been frightened of his brother, and that when he recanted at the preliminary hearing his earlier statements against his brother, he did so out of that fear.

■ The trial court has the discretion to admit evidence of crimes committed by a defendant other than the one for which he is charged, if such evidence is relevant to prove some fact at issue, and if the probative value of the evidence outweighs its prejudicial effect. (*People* v. *Daniels* (1991) 52 Cal.3d 815 [277 Cal.Rptr. 122, 802 P.2d 906].) "When reviewing the admission of evidence of other offenses, a court must consider (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.] Because this type of evidence can be so damaging, '[i]f the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded.' [Citation.]" (*Id.* at p. 856.)

■ The People argue in this case that testimony regarding defendant's stabbing of his brother was relevant to rehabilitate the credibility of the latter's testimony, a material issue in the case. We agree. First, there is no question that Gerald's credibility was a material issue. His testimony as to defendant's admission of culpability for the Sonny's Market crimes was key

---

grounds that the testimony was irrelevant and that its probative value outweighed its prejudicial effect. We conclude from this record that the stabbing was not already in evidence when defense counsel made his objection, and that the objection was adequate and timely made.

to the prosecution's case. Defense cross-examination concerning Gerald's prior inconsistent statements at the preliminary hearing had called his credibility into question.

Furthermore, evidence of the stabbing was relevant to the credibility issue. ■■■ As one commentator has stated: "[T]he prosecutor may introduce uncharged misconduct on redirect to explain a prior inconsistent statement mentioned during cross-examination. Just as the defendant's uncharged misconduct may make the witness hesitant on the stand, the misconduct may have motivated the witness to make an inconsistent statement before trial. The misconduct serves as the explanation for the contradictory statement." (Imwinkelried, Uncharged Misconduct Evidence (1994) § 6.23, p. 58, fns. omitted.) ■■■ Here, Gerald's testimony regarding his stabbing served to confirm his statements that fear of defendant motivated his untruthful testimony at the preliminary hearing. The testimony thereby served to rehabilitate Gerald's credibility.

In sum, Gerald's testimony about defendant's attack on him had considerable probative value in rehabilitating his contested but quite critical testimony. Under these circumstances, the trial court did not abuse its discretion in concluding that the evidence was relevant, that it was introduced to prove matters other than defendant's character, and that the probative value of this testimony outweighed its prejudicial effect. Accordingly, this testimony was properly admitted, and defendant's claim of error, under Evidence Code sections 352 and 1101, is without merit. Because we find no statutory error, defendant's related constitutional claims also fail.

## H. *Failure to Instruct on Lesser Related Offenses*

■■■ The trial court instructed the jury on the elements of first and second degree murder with regard to the Hedlund murder. Defendant now argues that the trial court should have instructed the jury on the lesser related offense of accessory after the fact to the murder. The court's failure to do so deprived defendant, he contends, of due process of law under the Fourteenth Amendment of the United States Constitution. We disagree for a number of reasons.

First, the trial court has no sua sponte duty to instruct the jury on lesser related offenses, and defendant's failure to request the instruction at trial waives the issue on appeal. (*People* v. *Carrera* (1989) 49 Cal.3d 291, 310 [261 Cal.Rptr. 348, 777 P.2d 121].)

Moreover, no accessory-after-the-fact instruction was warranted here. Even when the law does impose on the trial court a sua sponte duty to

instruct the jury, as in the case of lesser *included* offenses, that duty is not triggered "when there is no evidence that the offense was less than that charged." (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d 311].) In this case, there was no evidence that defendant was involved in the Hedlund murder as an accessory after the fact. Defendant argues that the primary evidence linking him to the Hedlund murder was his possession of the Hedlund murder weapon six days after the murder was committed, and that his possession could be equally well explained if he had been an accessory after the fact as if he had been the murderer. But other testimony had defendant leaving the Uptown Saloon around the same time as Hedlund, a few hours before Hedlund was murdered, indicating that defendant's involvement in the Hedlund murder commenced before, not after, the fact. Moreover, there is simply no evidence pointing to any other person's involvement in the murder, and an accessory-after-the-fact instruction would have been based on sheer speculation. The trial court's failure to give such an instruction was not error.

Defendant's claim of entitlement to a lesser related offense instruction is not strengthened by his invocation of *Beck* v. *Alabama* (1980) 447 U.S. 625 [65 L.Ed.2d 392, 100 S.Ct. 2382]. In that case, the United States Supreme Court overturned a portion of Alabama's death penalty law that had prohibited lesser included offense instructions from being given in capital cases, holding that such provision violated the defendant's Fourteenth Amendment right to due process. " 'The goal of the *Beck* rule . . . is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence.' " (*Schad* v. *Arizona* (1991) 501 U.S. 624, 646-647 [115 L.Ed.2d 555, 575, 111 S.Ct. 2491].) Subsequently, courts have held that *Beck*'s rationale applies not only to the actual imposition of the death penalty, but also to a first degree murder verdict that renders a defendant eligible for death. (*Vickers* v. *Ricketts* (9th Cir. 1986) 798 F.2d 369, 370-374.) But the logic of *Beck* does not apply when, as here, the jury has been properly instructed as to second as well as first degree murder.[5] The " 'central concern of *Beck* simply is not implicated . . . [when the] jury was not faced with an all-or-nothing choice

---

[5]Defendant argues, in contradiction to the argument referenced in part II. J., *post*, that the execution style of the Hedlund killing made it implausible that the murder was not premeditated, and that therefore second degree murder was not a credible alternative to first degree murder. Therefore, a "real" alternative lesser related offense, such as accessory after the fact, should have been given. That argument is fallacious on at least two grounds. First, even if it were true that all the evidence pointed to first degree murder rather than second degree murder, the trial court would not be obliged to instruct on a lesser offense other than second degree murder if, as here, no evidence supported that instruction. (*Spaziano* v. *Florida* (1984) 468 U.S. 447, 455 [82 L.Ed.2d 340, 349, 104 S.Ct. 3154].) Second, as defendant's argument discussed in part II. J., *post*, suggests, given the lack of motive and planning evidence, the

between . . . (capital murder) and innocence.' " (*Schad* v. *Arizona, supra,* 501 U.S. at p. 647 [115 L.Ed.2d at p. 575].)

More fundamentally, the *Beck* rule does not require an instruction on a lesser included offense when the evidence does not support it. "[D]ue process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." (*Hopper* v. *Evans* (1982) 456 U.S. 605, 611 [72 L.Ed.2d 367, 373, 102 S.Ct. 2049], italics in original.) By the same reasoning, *Beck* does not require instruction on a lesser related offense unsupported by the evidence. In this case, as explained above, no evidence warranted an accessory-after-the-fact instruction, and so the failure to give such an instruction offends neither the United States Constitution nor California law.

## I. *Reasonable Doubt Instructions*

■ Defendant claims that the reasonable doubt instruction contained in CALJIC No. 2.90 is not understandable, that the terms "moral certainty" and "moral evidence" are likely to confuse the jury, and that therefore the instruction is constitutionally flawed. Although this instruction has received strong criticism by members of the United States Supreme Court (see *Victor* v. *Nebraska* (1994) 511 U.S. __, __ [127 L.Ed.2d 583, 600-601, 601-602, 114 S.Ct. 1239, 1251, 1252-1254] (separate conc. opns. of Kennedy, J. and Ginsburg, J.) as well as by members of this court (*People* v. *Brigham* (1979) 25 Cal.3d 283, 296-316 [157 Cal.Rptr. 905, 599 P.2d 100] (conc. opn. of Mosk, J.) [recommending the Legislature improve upon the instruction], such instruction does not constitute error. (*Victor* v. *Nebraska, supra,* 511 U.S. at pp. __-__ [127 L.Ed.2d at pp. 595-599, 114 S.Ct. at pp. 1247-1249]; see also *People* v. *Freeman, supra,* 8 Cal.4th 450, 504-505 (maj. opn. by Arabian, J.), 526 (conc. opn. of Mosk, J.), 526-531 (conc. opn. of George, J.).)

Defendant also claims that the standard instruction regarding reasonable doubt and circumstantial evidence (CALJIC No. 2.01) misleads the jury by stating that, "If . . . one interpretation [of the evidence] *appears* to be reasonable and the other interpretation to be unreasonable, it would be your duty to accept the reasonable interpretation and to reject the unreasonable." (Italics added.) He argues that this language in effect informs the jury that it may find a defendant guilty if he reasonably appears to be guilty, even when jurors still entertain a reasonable doubt of the defendant's guilt. We reject that challenge, as we did in *People* v. *Jennings* (1991) 53 Cal.3d 334, 386

---

question of defendant's premeditation in the Hedlund murder was one on which reasonable jurors could differ, and a second degree murder instruction was amply justified.

[279 Cal.Rptr. 780, 807 P.2d 1009]: "The plain meaning of [this instruction] merely informs the jury to reject unreasonable interpretations of the evidence and to give the defendant the benefit of any reasonable doubt. No reasonable juror would have interpreted these instructions to permit a criminal conviction where the evidence shows defendant was 'apparently' guilty, yet not guilty beyond a reasonable doubt."

We therefore reject defendant's claims that instructing the jury under CALJIC Nos. 2.01 and 2.90 was error, whether these instructions are considered separately or in conjunction.

### J. Sufficiency of Evidence as to the Hedlund Murder

■■ Defendant makes essentially two types of insufficiency of evidence claims in connection with his conviction for the Hedlund murder: first, that there was insufficient evidence that he murdered Hedlund; second, that there was insufficient evidence of premeditation and deliberation to convict him of first degree murder. Neither claim has merit.

■ When considering the claim of a criminal defendant that a verdict was not supported by sufficient evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; see also *Jackson* v. *Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574, 99 S.Ct. 2781].)

■ The first of defendant's two contentions need not detain us long. There was sufficient evidence linking defendant to the Hedlund murder. First, as discussed above, unrebutted ballistics evidence, in conjunction with the eyewitness testimony of Jerry Stevens, placed the Hedlund murder weapon in defendant's hands approximately six days after Hedlund's murder. Second, Jill Gibbs testified that defendant and Hedlund left the Uptown Saloon, where Hedlund was last seen alive, within minutes of each other. Defendant and Hedlund had played pool that night, and had developed some sort of association. It was also a fact that Hedlund did not own a working automobile, and the jury could have inferred Hedlund received a ride from defendant. Hedlund was wrapped in a horse blanket covered with bird feathers and horsehair. Defendant had stayed shortly before that time on a horse ranch whose owner raised birds. All this evidence was sufficient to permit a rational trier of fact to conclude that defendant was guilty beyond a reasonable doubt of the Hedlund murder.

 Defendant's second claim—that there is insufficient evidence defendant committed the Hedlund murder with premeditation and deliberation —is also without merit. The unrefuted testimony of a forensic expert showed that Hedlund was shot twice, once in the back of the head near the base of the skull and once in the back of the neck. According to the pathologist's examination of the burned and unburned gunpowder residues found on Hedlund's body, one of the shots was fired from a close range, between three and twelve inches away. The angle of entry and the downward trajectory of the bullets through Hedlund's body suggest that the position of the gun was somewhere above his head. As defendant was several inches shorter than Hedlund, it could be reasonably surmised that Hedlund may have been crouching or kneeling at the time the shots were fired. The manner of the killing clearly suggests an execution-style murder.

Moreover, there was little if any evidence of struggle, except for a single scratch on Hedlund's throat, that might lend support to the hypothesis that the murder occurred on impulse or in a rage. There were no signs that Hedlund had struggled with his assailant. The relatively superficial abrasions on the face and neck are consistent with the victim's fall forward after having been shot in the back of the head. A trier of fact could have concluded from such evidence that the Hedlund murder was committed with premeditation and deliberation.

 Defendant contends that *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] supports his argument that evidence of premeditation and deliberation was insufficient in this case. In *Anderson* we identified three types of evidence used to sustain a finding of premeditation. These were: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)." (*Id.* at pp. 26-27.) The *Anderson* court concluded that "this court sustains [a first degree murder conviction] when there is evidence of all three types and

otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Id.* at p. 27.) Defendant claims that there was no evidence of planning and motive, and that, under *Anderson*, manner-of-killing evidence alone is insufficient to prove beyond a reasonable doubt premediation and deliberation.

Defendant's reliance on *Anderson*, however, is of no avail. As this court recently stated, "The *Anderson* analysis was intended only as a framework to aid in appellate review; it did not propose to define the elements of first degree murder or alter the substantive law of murder in any way." (*People* v. *Perez* (1992) 2 Cal.4th 1117, 1125 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) The *Anderson* guidelines were formulated as a synthesis of prior case law, and are not a definitive statement of the prerequisites for proving premeditation and deliberation in every case.

Specifically, the *Anderson* court had no occasion to consider a case like the present one, in which evidence of the manner of killing strongly pointed to an execution-style murder. *Anderson* recognized that manner-of-killing evidence is often ambiguous, and frequently cannot be relied on by itself to support an inference of premeditation beyond a reasonable doubt. But *Anderson* did not confront the question whether manner-of-killing evidence which clearly indicates an execution-style murder was sufficient to sustain a first degree murder verdict. We have recognized elsewhere the strength of such evidence in support of a finding of premeditation and deliberation. (*People* v. *Bloyd* (1987) 43 Cal.3d 333 [233 Cal.Rptr. 368, 729 P.2d 802].) In *Bloyd* the forensic evidence "described actions that were cold and calculated," shots to the head taken at extremely close range while one of the victims was on her back, the other kneeling, with no bruises and lacerations to show a struggle. (*Id.* at p. 348.) Although the *Bloyd* court found evidence of motive as well, such evidence is not indispensable to proving premeditation when the manner-of-killing evidence is so compelling. (See *People* v. *Davis* (1995) 10 Cal.4th 463, 510-511 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

In sum, although evidence of planning and motive was indeed minimal if not totally absent in the present case, we conclude that the manner-of-killing evidence was sufficiently strong to permit a trier of fact to conclude beyond a reasonable doubt that defendant committed the Hedlund murder with premeditation and deliberation. We therefore reject in toto defendant's insufficiency of evidence arguments.

K. *Failure to Give "Heat of Passion" Instruction*

The murders of which defendant was convicted were committed in March of 1987, in the window period between the time we decided *Carlos* v.

*Superior Court* (1983) 35 Cal.3d 131, 153-154 [197 Cal.Rptr. 79, 672 P.2d 862] (*Carlos*) and the time we overruled *Carlos* in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306]. Therefore the rule set forth in *Carlos* is applicable to this case: in order to find against defendant the felony-murder special circumstance (§ 190.2, subd. (a)(17)), the jury must find that defendant had an intent to kill. (*People* v. *Ashmus* (1991) 54 Cal.3d 932, 981 [2 Cal.Rptr.2d 112, 820 P.2d 214].)

Defendant recognizes that an "intent to kill" instruction was properly given to the jury. But he argues that additional instruction should have been given sua sponte to clarify the *Carlos* instruction. Specifically, he argues there was evidence that the Hicks murder occurred when Hicks, acting as a Good Samaritan, attempted to surprise him from behind in order to foil the robbery. Defendant therefore claims that the evidence supported a theory that his murder of Hicks was "upon a sudden quarrel or in the heat of passion," which would be a voluntary manslaughter but for the fact that the murder was committed in the course of committing a felony. He further argues that if the jury were to find that his state of mind was identical to the state of mind for committing voluntary manslaughter, and therefore that he lacked malice aforethought in committing the Hicks murder, then it would have been unable to find an intent to kill. If such were the case, then the jury could not, under *Carlos*, find the felony-murder special circumstance to be applicable to defendant. He therefore contends that the trial court committed prejudicial error in failing to give a "heat of passion" instruction sua sponte, or, in the alternative, that counsel rendered ineffective assistance in failing to request such an instruction.

Even if we were to accept defendant's claim, arguendo, that evidence supported the theory that defendant killed upon a sudden quarrel or in the heat of passion, defendant's claim fails. Defendant's argument is based on the premise that malice aforethought and intent to kill describe identical mental states. Because the "heat of passion" mental state necessary for voluntary manslaughter is statutorily defined to negate the element of malice (§ 192, subd. (a)), that mental state must also therefore negate the element of intent to kill. But that premise is fallacious. It has been long held that voluntary manslaughter presupposes an intent to kill, but that, in spite of that intent, certain statutorily defined mitigating circumstances negate the element of malice aforethought. (*People* v. *Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8]; 2 LaFave & Scott, Substantive Criminal Law (1986) § 7.10, pp. 253-254.) As we stated in *Brubaker*: "Voluntary manslaughter is a willful act, characterized by the presence of an intent to kill, engendered by sufficient provocation and by the absence of premeditation, deliberation and (by presumption of law) malice aforethought." (*Brubaker, supra*, 53 Cal.2d

at p. 44, italics omitted.) Accordingly, a defendant who kills upon a sudden quarrel or in the heat of passion in the course of committing a felony would still be found to have an intent to kill within the meaning of our *Carlos* decision, and the felony-murder special circumstance would still be applicable to him.

In support of his argument, defendant relies on our discussion of voluntary manslaughter in *People* v. *Saille* (1991) 54 Cal.3d 1103, 1113-1115 [2 Cal.Rptr.2d 364, 820 P.2d 588]. There we considered the effect of the 1982 amendment to section 188, which redefined malice so as to eliminate the diminished capacity defense. Earlier cases had held that under circumstances of diminished capacity, a defendant might have the intent to kill, but not have the mental state of "malice aforethought," and therefore be guilty only of voluntary manslaughter. (See, e.g., *People* v. *Conley* (1966) 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].) The holdings in these cases were premised on the notion that the mental state of malice consisted of an element of self-consciousness above and beyond that of a mere intent to kill, i.e., an "awareness of the obligation to act within the general body of laws regulating society." (*Id.* at p. 322.) In *Saille* we recognized that in the 1982 amendments the Legislature had repudiated these refinements of case law, and that section 188 now essentially defines express malice as simply an intent to kill, except when section 192, the manslaughter statute, specifically enumerates circumstances in which malice is considered to be absent. As we stated in *Saille*: "[W]hen an intentional killing is shown, malice aforethought is established. . . . [¶] . . . Section 192, however, negates malice when the *intentional* killing results from a sudden quarrel or heat of passion induced by adequate provocation." (*Saille, supra*, at p. 1114, italics added.) *Saille* therefore did not alter the doctrine of earlier case law that voluntary manslaughter is an unlawful killing with an intent to kill but without malice; it merely made clear that, after the 1982 amendment of section 188, the circumstances in which absence of malice can be shown are only those set forth in statute.

We therefore conclude that, even if defendant had acted "upon a sudden quarrel or in the heat of passion," he would have still acted with an intent to kill and so, under *Carlos*, would still have been found subject to the felony-murder special circumstance. Consequently, failure to give a heat of passion instruction in connection with the felony-murder special circumstance instruction was not error on the part of the trial court, nor was failure to request such an instruction error on the part of trial counsel.[6] As defendant himself recognized in his opening brief, the defense of an actual but unreasonable belief in the necessity to defend oneself against imminent peril to

---

[6]Because we reject defendant's claim of instructional error, we also reject his claim that the multiple-murder special-circumstance finding must be set aside under the rationale set forth in

life or great bodily injury, is, in his own words, "a specialized circumstance of heat of passion" based upon provocation, and, accordingly, his contention that an instruction on that defense should have been given must be rejected for the same reasons.

## III. Penalty Phase Contentions

### A. *Prosecutorial Misconduct During Closing Argument*

 Defendant contends that the prosecutor committed several acts of prejudicial misconduct during the penalty phase closing argument and rebuttal. Trial counsel failed to object to these alleged incidents of misconduct, however, and as such, any claim is generally waived on appeal. (*People v. Dyer* (1988) 45 Cal.3d 26, 81 [246 Cal.Rptr. 209, 753 P.2d 1]; *People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant nonetheless claims that the prosecutorial misconduct was such that a timely objection could not have cured the harm, and that therefore the issue is preserved for appeal. (See *People v. Green, supra,* 27 Cal.3d at p. 34; *People v. Kirkes* (1952) 39 Cal.2d 719, 726 [249 P.2d 1].) Alternatively, he claims that defense counsel's failure to object to the prosecutor's supposed flagrantly prejudicial statements constitutes ineffective assistance of counsel. As will appear, none of defendant's contentions have merit.

Defendant claims in essence three types of prosecutorial misconduct, each of which will be considered in turn:

### 1. *Future Dangerousness*

Defendant points to the prosecution's exposition on the issue of his future dangerousness and his potential menace to prison personnel. After reviewing the eight felony convictions—most of them involving violence—to which defendant had stipulated, as well as his present crimes and other acts of violence for which he had not been charged, the prosecutor then went on to argue that defendant might continue his violent behavior if he were given a life sentence. For example, the prosecutor stated: "For Herman Hicks, for Jerry Stevens, for John Hedlund, for the countless other people who have experienced firsthand the violence of Jeffrey Hawkins, [listing several victims from his previous felonies], and really for unborn generations in the

---

*People v. Turner* (1984) 37 Cal.3d 302, 329 [208 Cal.Rptr. 196, 690 P.2d 669]. In *Turner,* we held, as a logical extension of *Carlos,* that a multiple-murder special-circumstance finding (§ 190.2, subd. (a)(2)) requires intent to kill in at least one of the first degree murder convictions that formed the basis of the multiple-murder special-circumstance finding. Here, the jury was instructed on, and found, intent to kill in *both* the Hicks and Hedlund murders. The multiple-murder special circumstance is therefore not vulnerable on grounds of *Turner* error.

future, I say enough is enough of this man." Elsewhere, the prosecutor stated defendant was "a malevolent presence, waiting to strike at any moment, coiled like a snake, never knowing when that violence is going to erupt and kill someone."

" '[W]e have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert opinion, is proper and does not invite speculation as to the defendant's possible release. . . .' Moreover, 'we have consistently held that it is not misconduct for a prosecutor to argue at the penalty phase that if a defendant were sentenced to prison he might kill another prisoner. . . .' " (*People* v. *Fierro* (1991) 1 Cal.4th 173, 249 [3 Cal.Rptr.2d 426, 821 P.2d 1302].) In this case, the prosecutor's argument on future dangerousness was based on defendant's extensive record of violence rather than expert opinion and was fairly supported by the evidence.

Nor is defendant's claim of ineffective assistance of counsel for failure to object to the prosecutor's remarks on future dangerousness well founded. Because there is little chance such an objection would have succeeded in light of this court's holdings on the permissibility of future dangerousness arguments at the time of trial (see *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861]), defendant cannot show deficient performance in his trial counsel's failure to object.

### 2. *Epithets*

In the course of summarizing defendant's career of criminal violence, the prosecutor referred to defendant as "coiled like a snake." The act of sentencing defendant to life in prison was compared to "putting a rabid dog in the pound." Defendant contends that this dehumanizing language improperly inflamed the jury's passions and further invited them to speculate on defendant's future conduct. We do not condone the use of such terms in argument. But as we have held, the use of such opprobrious epithets is not necessarily misconduct. (*People* v. *Sandoval* (1992) 4 Cal.4th 155, 180 [14 Cal.Rptr.2d 342, 841 P.2d 862].) Further, when the prosecutor's penalty phase argument is viewed as a whole, these epithets played an extremely minor role, in comparison to the lengthy discussion of defendant's prior criminal and violent acts. In this instance we find no misconduct from these remarks.

### 3. *Comments on Defendant's Conduct in Prison*

During defendant's closing argument, trial counsel commented in essence that the prosecutor had not introduced any evidence, at the penalty phase, of

defendant's misbehavior while incarcerated, other than a single incident that had occurred in the county jail while defendant was awaiting trial. Counsel argued that the obvious implication of this lack of evidence was that defendant had not had significant problems while incarcerated, and that therefore there was little risk in sentencing defendant to prison for life without possibility of parole. In rebuttal, the prosecutor responded to those comments by stating: "Defense counsel suggested that Jeffrey Hawkins does well in prison, that we ought to put him there, because that's a good place for him. And you know that, because the prosecution didn't present any evidence of his wrongdoing in prison. [¶] Well, that isn't necessarily the inference that follows. Now, [defense counsel] had his opportunity to present evidence in mitigation. Part of that evidence that Jeffrey Hawkins would do so well in prison would be, wouldn't you think, the fact that he was a model prisoner, if that were the fact?"

Defendant contends that these rebuttal remarks strongly suggested that the prosecutor possessed information outside the evidentiary record that he had misbehaved while in prison, and that this improper suggestion constituted misconduct. However, the prosecutor's remarks immediately after the ones quoted above belie this contention. "The bottom line of all this: Don't be misled to think one way or the other, because there was no evidence presented about how he behaved in prison. It's just not part of the evidence. You shouldn't draw any inferences one way or the other." Thus, the prosecutor's rebuttal remarks, taken in context, do not imply that he had a covert knowledge of defendant's violent prison behavior, but rather were designed to counter the negative inference by defense counsel that the lack of evidence of defendant's prison misconduct was positive evidence of good conduct. As such, these remarks did not constitute prosecutorial misconduct.

## B. *Instructional Error Regarding Uncharged Crimes*

 During the penalty phase, the prosecutor introduced evidence of other crimes falling within section 190.3, factor (b), namely the alleged assault with a deadly weapon against a drug dealer in 1980 and the alleged stabbing of his brother Gerald around the time defendant was most recently apprehended in 1987, as well as two instances of resisting arrest. On appeal, defendant complains of two deficiencies in the trial court's instructions regarding the manner in which the jury was to consider those uncharged crimes: (1) the trial court erred in the reasonable doubt instruction it gave to the jury; and (2) the trial court failed to instruct the jury sua sponte as to the elements of these alleged other crimes. Each of these contentions shall be considered in turn.

### 1. *Inadequate Reasonable Doubt Instruction*

A trial court must properly instruct the jury at the penalty phase that uncharged crimes must be proved true beyond a reasonable doubt before they can be considered by the jury as aggravating factors in the penalty determination. (*People* v. *Pinholster* (1992) 1 Cal.4th 865, 965 [4 Cal.Rptr.2d 765, 824 P.2d 571].) In this case, defendant contends that the trial court prejudicially erred by giving the jury an erroneous reasonable doubt instruction.

At the penalty phase, reasonable doubt as to uncharged crimes was defined as follows: "[I]t is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case which, *after the evidence*, leaves the minds of jurors in that condition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Italics added.) The definition follows verbatim the one found in CALJIC No. 2.90, except that it erroneously omitted several words from the second sentence of the instruction. That sentence should read: "It is that state of the case which after *the entire comparison and consideration of all the* evidence, leaves the minds of the jurors in that condition that they cannot say that they feel an abiding conviction, to a moral certainty, of the truth of the charge." (Omitted portion in italics.)

Defendant contends that this omission rendered the reasonable doubt instruction unintelligible and that the reversal of the penalty phase verdict is required. We disagree. Small errors in the reasonable doubt instruction that are not likely to confuse or mislead the jury are harmless. (See *People* v. *Simpson* (1954) 43 Cal.2d 553, 566 [275 P.2d 31]; *People* v. *Castro* (1945) 68 Cal.App.2d 491, 498 [157 P.2d 25].) In this case, the jury was likely to interpret the phrase "after the evidence" to mean "after the evidence is considered," and to understand by this instruction the almost self-evident principle that the determination of defendant's culpability beyond a reasonable doubt for an uncharged crime must be based on a review of the evidence presented. There was no likelihood, in short, that the trial court's elision would result in significant juror misunderstanding of the reasonable doubt standard.

### 2. *Failure to Instruct on Elements of Crime*

We also do not find the trial court's failure to instruct on the elements of the uncharged crimes to be error, because the trial court has no such sua sponte obligation. As we have explained, a defendant may have tactical

reasons for not requesting such an instruction, because undue emphasis to the jury might be placed on these crimes. Therefore imposition on the court of a duty to automatically instruct, despite defendant's preferences, is unwarranted. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Hardy* (1992) 2 Cal.4th 86, 207 [5 Cal.Rptr.2d 796, 825 P.2d 781].) Accordingly, the trial court was correct not to instruct sua sponte as to the elements of these crimes.

### C. *Unconstitutionality of Sentencing Factors*

Defendant contends that section 190.3, factors (a) and (b), are vague under the Eighth Amendment. They are not. Factor (a) provides that the jury may consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." Factor (b) provides that the jury may consider "[t]he presence or absence of criminal activity by the defendant which involved the use of force or violence . . . ." Defendant argues that these factors fail to adequately specify what it is about the circumstances of the crime in the case of factor (a), or what about defendant's past criminal activity in the case of factor (b), that the jury should consider in rendering a penalty decision. Defendant therefore contends that both factors are unconstitutionally vague because they fail to adequately guide and limit the jury's discretion in choosing a capital sentence over life without parole, and accordingly that the California death penalty statute violates the Eighth Amendment of the United States Constitution under the teaching of *Furman* v. *Georgia* (1972) 408 U.S. 238 [33 L.Ed.2d 346, 92 S.Ct. 2726] and its progeny. The United States Supreme Court has recently rejected that argument. (*Tuilaepa* v. *California* (1994) 512 U.S. __, __ [129 L.Ed.2d 750, 762-763, 114 S.Ct. 2630, 2637].)

Defendant makes the related argument that section 190.3 is constitutionally defective because it fails to specify which of the factors it enumerates are to be considered aggravating and which mitigating. As such, defendant argues, these sentencing factors also fail to safeguard against a jury's arbitrary and capricious sentencing practices and therefore violate the Eighth Amendment. The United States Supreme Court has also recently rejected this argument. (*Tuilaepa* v. *California, supra,* 512 U.S. at p. __ [129 L.Ed.2d at pp. 763-764, 114 S.Ct. at p. 2638].)

### D. *Failure to Instruct Sua Sponte That No Adverse Inference Should Be Drawn From Defendant's Failure to Testify at the Penalty Phase*

Defendant contends that the trial court failed to instruct the jury sua sponte not to draw any inferences from defendant's failure to testify, in

violation of defendant's Fifth and Fourteenth Amendment right against self-incrimination. We have repeatedly held that the trial court has no such sua sponte duty. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 153 [249 Cal.Rptr. 320, 756 P.2d 1348]; *People* v. *Melton* (1988) 44 Cal.3d 713, 758 [244 Cal.Rptr. 867, 750 P.2d 741].) Nothing in the facts of the present case warrants any departure from that rule.

E. *Failure of Trial Court to Define Sua Sponte the Terms "Aggravating" and "Mitigating"*

Defendant contends that the trial court erred by failing to define, sua sponte, the terms "aggravating" and "mitigating" when instructing the jury during the penalty phase. Specifically, he argues that the trial court should have defined an aggravating factor in the words of CALJIC No. 8.88 (as revised in 1989) as "any fact, condition or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences *which is above and beyond the elements of the crime itself.*" (Italics added.) He claims that this definition would make clear that the jury could not consider in aggravation such conduct as constituted the basic elements of the crimes of which he was convicted. Without such instruction, the jury may well have used the two first degree murders by themselves as an aggravating circumstance, in violation of the statutory scheme for determining penalty phase verdicts set forth in section 190.3. The failure to properly instruct is, defendant claims, an error of constitutional dimension, violating his right to a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Defendant's claim fails for two reasons. First, it is well established that the words " 'aggravating' and 'mitigating' are commonly understood terms that the trial court need not define for the jury." (*People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248].) Accordingly, a court need not give an instruction clarifying these terms on defendant's request, and therefore certainly has no sua sponte obligation to do so. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 50 [23 Cal.Rptr.2d 593, 859 P.2d 673].)

Second, section 190.3, factor (a), specifically permits the jury to consider at the penalty phase "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." As we have held, the trial court need not give a " 'clarifying gloss' " on factor (a) " 'to inform the jury that its penalty determination must not be based on facts that are "common to all homicides." ' " (*People* v. *Wright* (1990) 52 Cal.3d 367, 445 [276 Cal.Rptr.

731, 802 P.2d 221].) The argument to the contrary reveals "a 'basic misunderstanding' of the statutory scheme since, in order to perform its moral evaluation of whether death was the appropriate penalty, the facts of the murder 'cannot comprehensibly be withdrawn from the jury's consideration . . . .' " (*People* v. *Wright, supra,* 52 Cal.3d at p. 445.)

Defendant in the present case focuses on the supposed ambiguity of the term "aggravating" rather than the supposed ambiguity of section 190.3, factor (a), but our conclusion must be the same. There is no constitutional or statutory requirement that the penalty phase jury be instructed that, in considering the circumstances of the crime, it must factor out those constituent parts of the crime that are common to all first degree premeditated murders, or to all first degree felony murders, to properly arrive at its verdict. Though a clarifying instruction such as the one found in the present CALJIC No. 8.88 may be helpful in aiding the jury's understanding of its precise task (see *People* v. *Dyer, supra,* 45 Cal.3d at pp. 77-78), the failure to sua sponte administer this instruction is not reversible error. (*People* v. *Johnson, supra,* 6 Cal.4th at p. 50.) We therefore find defendant's claim, whether couched in state law or federal constitutional terms, to be without merit.

F. *Constitutional Issues Regarding Second Penalty Phase Jury*

 As stated above, the first jury deadlocked at the penalty phase, voting eight to four to sentence defendant to death. Defendant now makes several claims of error revolving around the constitutionality of having a second penalty phase jury sentence him to death without having heard all the guilt phase evidence. Defendant argues that, under the principles set forth by the United Supreme Court in *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 989-990, 98 S.Ct. 2954], a defendant facing the sentence of death has the right, under the Eighth Amendment of the United States Constitution, to introduce any evidence in mitigation, including evidence that would reinforce the jury's sense of lingering doubt as to the defendant's guilt. By divorcing the penalty phase from the guilt phase and presenting defendant's guilt in the Hedlund murder as a given, defendant was deprived of the possible benefit of whatever lingering doubts the first jury may have possessed as to whether defendant was the one who murdered Hedlund. It was this lack of lingering doubt, defendant contends, that allowed the second penalty phase jury to do what the first jury was unable to do: unanimously agree on a sentence of death.

Defendant is mistaken. It is true that residual doubt about a defendant's guilt is something that juries may consider at the penalty phase under

California law, and a trial court errs if it excludes evidence material to this issue. (*People* v. *Terry* (1964) 61 Cal.2d 137, 147 [37 Cal.Rptr. 605, 390 P.2d 38]; *People* v. *Cox* (1991) 53 Cal.3d 618, 677-678 [280 Cal.Rptr. 692, 809 P.2d 351].) Here, however, defendant was not prevented from putting on guilt phase evidence at the penalty phase so as to raise the possibility of lingering doubt, or from advocating this theory at closing argument. Defendant did in fact argue to the jury that the forensic evidence had failed to establish beyond a reasonable doubt that the Hedlund murder had been committed with premeditation and deliberation; he chose not to present evidence or to make an argument, however, that would raise the issue of reasonable doubt regarding his identity as Hedlund's murderer. We have never held that the right to introduce evidence of residual doubt translates into the right to have the same jury at the guilt and penalty phases. Indeed, the *Terry* court, which first recognized the former right, assumed that a capital defendant's trial by different guilt and penalty phase juries was lawful, so long as defendant was able to introduce to the penalty phase jury guilt phase evidence intended to show lingering doubt. (*Terry*, *supra*, 61 Cal.2d at pp. 146-147.) Defendant did not attempt to introduce such evidence at the second penalty phase trial and cannot complain of any state law violation in this regard.

Moreover, contrary to defendant's contention, a capital defendant has no federal constitutional right to have the jury consider lingering doubt at the penalty phase of the trial. (*Franklin* v. *Lynaugh* (1988) 487 U.S. 164, 173-174, fn. 6 [101 L.Ed.2d 155, 165-166, 108 S.Ct. 2320].)

Defendant makes the related claim that his right to equal protection of the laws under the Fourteenth Amendment of the United States Constitution was violated by being tried by a penalty phase jury that did not hear all the guilt phase evidence; he was put in a worse position than a similarly situated, death-eligible defendant whose guilt and penalty were decided by the same jury, because he could not benefit from lingering doubt to the same degree as the latter defendant. This claim is without merit. As discussed above, a bifurcated trial does not restrict a defendant's ability to introduce guilt phase evidence designed to foster residual doubt. Nor, of course, is it at all clear that a defendant whose penalty has been determined by a second jury is put at a disadvantage; he may also benefit from having a jury which has not focused at length on the details of his crimes. Defendant's equal protection claim is therefore without merit.

Defendant also contends that the trial court's refusal to permit defense counsel to refer to the results of the first penalty phase deadlock was constitutional error under the Eighth Amendment. He argues that his right to

have all mitigating evidence heard by the penalty phase jury (see *Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [97 L.Ed.2d at pp. 989-990]) includes the right to have the second jury consider that the first jury was unable to agree on a penalty. He further argues that the second jury might have concluded from the first jury's deadlock that the first jury entertained lingering doubt regarding the Hedlund murder. Defendant's contentions are without merit.

As we have elsewhere declared, the fact of a first jury's deadlock, or its numerical vote, is irrelevant to the issues before the jury on a penalty retrial. (*People* v. *Thompson* (1990) 50 Cal.3d 134, 178 [266 Cal.Rptr. 309, 785 P.2d 857].) Although, as discussed above, guilt phase evidence may be relevant to the matter of residual doubt, which in turn may be considered by the jury in mitigation, the fact of the jury's deadlock is not pertinent to this or any other mitigating circumstance. All that can reasonably be inferred from the first jury's failure to agree on a penalty is that the jurors differed as to defendant's moral culpability for any number of reasons. The evidence of deadlock does not go to defendant's " 'character,' 'record,' or a 'circumstance of the offense,' " relevant to the individualized determination of the penalty in capital cases. (*Franklin* v. *Lynaugh, supra,* 487 U.S. at p. 174 [101 L.Ed.2d at pp. 165-166], quoting *Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110 [71 L.Ed.2d 1, 8, 102 S.Ct. 869].) The fact of the first deadlocked jury was therefore immaterial to the second penalty phase jury's task, and the trial court did not err in excluding reference to it.

Finally, defendant charges his trial counsel with ineffective assistance for failing to request a lingering doubt instruction at the penalty phase. We find no deficient performance by counsel in this instance, and therefore reject defendant's contention. Defendant argues that, given the relative uncertainty of the evidence in the Hedlund case, there was no good reason *not* to request a lingering doubt instruction. This argument misses the point. Defendant's trial counsel appears to have decided, for reasons that we cannot say were unsound, not to re-present the guilt phase evidence of the Hedlund murder, thereby de-emphasizing the murder itself. Instead trial counsel focused on elements in defendant's background that might persuade a jury toward leniency. Because of this strategic decision, the jury had no evidentiary basis, as discussed in part III. G., *post,* for considering any residual doubt as to defendant's identity as Hedlund's murderer. Therefore trial counsel's failure to request a lingering doubt instruction was consistent with their penalty phase defense strategy. ■ When considering trial counsel's performance in an ineffective assistance claim, we " 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 786 P.2d 892], quoting *Strickland* v. *Washington, supra,* 466

U.S. at p. 689 [80 L.Ed.2d at pp. 694-695].) We cannot say that trial counsel's decision not to re-present the evidence in the Hedlund murder, and therefore not to create a context in which a residual doubt instruction would be meaningful, was unreasonable.

### G. *Erroneous Reference to Guilt Phase Comment*

 During the second penalty phase trial, as discussed above, the prosecutor did not present evidence of the Hedlund murder other than the verdict form showing that defendant was found guilty of the murder in the first degree, and evidence regarding the condition in which Hedlund's body was found. He did not present to the second penalty phase jury the ballistics evidence linking the gun used to murder Hedlund to the gun used to kill Hicks. The trial court, however, in response to an inquiry from the jury during their deliberations, made a passing reference to the ballistics evidence, to which defense counsel did not object. Defendant now contends that this misstatement by the trial court was reversible error. We disagree.

The second penalty phase jury, directing a question to the trial court during its deliberations, asked the trial court to define special circumstances and also asked: "[P]ertaining to special circumstances No. 2, multiple murders, should this become a special circumstance only after Mr. Hicks was killed, or did Mr. Hedlund's death have separate special circumstances?" In clarifying the use of the term "special circumstances," the court explained that there were no special circumstances arising from the Hedlund murder alone, and then stated: "The only special circumstances as to the Hedlund murder—that's the one that happened earlier, March 4, under details we don't know—You simply heard testimony of the finding of the body and . . . *ballistics matchup of the weapons.* The only special circumstance referable with that one is the so-called multiple murder, the fact that there were convictions of two murders in this one case, this one proceeding here in court." Defendant did not raise any objection to the trial court's mistaken reference to the ballistics evidence.

Defendant claims that the trial court's comment on evidence of the ballistics testimony without permitting him to cross-examine the ballistics experts who were the source of that testimony amounts to a violation of the confrontation clause under the Sixth Amendment of the United States Constitution, and article I, section 15 of the California Constitution. (See *Delaware* v. *Van Ardsdall* (1986) 475 U.S. 673, 679-680 [89 L.Ed.2d 674, 683-684, 106 S.Ct. 1431]). He also contends that the trial court's remarks violated his due process right under the Fourteenth Amendment of the United States Constitution and article I, section 15 of the California Constitution in having the penalty phase verdict determined by evidence other than

that presented at trial. (See *United States* v. *Schuler* (9th Cir. 1987) 813 F.2d 978, 981-982 [prosecutor's comment on nontestifying defendant's conduct in the courtroom violates Fifth Amendment due process right].) Defendant argues that such violations of his constitutional rights amount to reversible error, unless it can be shown beyond a reasonable doubt that the error was not prejudicial. (*Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Defendant failed to object to the trial court's remark, and therefore waives the claim of constitutional error on appeal. (Cf. *People* v. *Benson, supra,* 52 Cal.3d 754, 788.)

Further we find that, under whatever harmless error standard is employed, defendant was not prejudiced by the trial court's remark regarding the "ballistic matchup of weapons." Defendant's argument to the contrary is based on the premise that the second penalty phase jury may have been harboring some lingering doubt as to defendant's guilt in the Hedlund murder that might have influenced its verdict at the penalty phase, and that the trial court's comment on the ballistics evidence in the Hedlund murder would have served to remove or diminish that lingering doubt. That premise is erroneous. The jurors in the second penalty phase trial had no basis for entertaining any lingering doubt as to defendant's identity as Hedlund's murderer, having only been told of defendant's conviction but not the evidence supporting it. Indeed, defendant argues elsewhere (see pt. III. F., *ante*) that his sentencing by a second penalty phase jury unfamiliar with the guilt phase evidence deprived him of the lingering doubt about the Hedlund murder that the first jury might have entertained. The trial court's scarcely intelligible remark regarding a "ballistics matchup" could not, therefore, have reduced a lingering doubt that could not plausibly be deemed to have existed. Accordingly, even under the strictest harmless error standard, the trial court's reference to the ballistics evidence in the Hedlund case cannot have been prejudicial.

## H. *Application for Modification of the Verdict of Death*

██ Defendant contends that the trial court erred in its review of the death penalty verdict under section 190.4, subdivision (e), by reading the probation report before making its determination under that section, and by making reference to material contained therein. The record does indeed show that the court had read the report, and referred at the outset of its section 190.4, subdivision (e) review to material in that report pertaining to defendant's juvenile criminal record. We conclude, however, that the error was harmless.

As we have explained, when the trial court reviews a death penalty verdict under section 190.4, subdivision (e), it is limited to consideration of the evidence presented to the penalty phase jury, which does not include the probation report. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221].) Nonetheless, it is presumed that the court was not influenced by irrelevant matters in the probation report, absent evidence to the contrary. (*Ibid.*; *People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906].)

In this case, that presumption of lack of prejudice is well supported in the record. At the outset of its section 190.4, subdivision (e) review, the trial court referred briefly to several instances of defendant's criminal activity found in the probation report, including at least one occurring when he was still a juvenile. The prosecutor was quick to remind the court, however, that it was obliged to consider only the evidence before the jury. After that, the trial court continued the review, properly confining itself to the evidence presented at the second penalty phase. The trial court found after this review that "the aggravating circumstances [in this case] immensely, not just by a narrow margin, but to a profound degree outweighed the mitigating circumstances," and that therefore the jury verdict was not contrary to law or to the evidence presented. Thus, the record indicates that the trial court promptly cured its initial error, and did not rely improperly on matters in the probation report in making its section 190.4, subdivision (e) determination.[7]

## IV. DISPOSITION

For all of the foregoing, the judgment is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., George, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied October 18, 1995, and the opinion was modified to read as printed above.

---

[7]The trial court also made a passing reference during its section 190.4, subdivision (e) review to the ballistics evidence in the Hedlund murder. As explained in part III. D., *ante*, such evidence was not before the second penalty phase jury, and therefore should not have been considered by the trial court when reviewing the case under section 190.4, subdivision (e). But defendant's claim that prejudicial error resulted from this brief remark outside the evidentiary record is without conceivable basis.