[EDITORS' NOTE: THIS OPINION IS DEPUBLISHED UPON GRANTING OF PETITION FOR REVIEW. THE OPINION APPEARS BELOW WITH A GRAY BACKGROUND.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1494 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1495 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1496 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1497 
OPINION
Rodney James Alcala petitions us for an alternative writ Of prohibition or mandate to prevent his single trial on multiple charges of murder which occurred in both Los Angeles County and Orange County. Originally, Alcala faced the single prosecution for the kidnapping and murder of 12-year-old Robin Samsoe that occurred in Orange County in 1979. He was convicted, and the death penalty was imposed. That judgment was reversed in People v. Alcala (1984) 36 Cal.3d 604, 621
[205 Cal.Rptr. 775, 685 P.2d 1126] (Alcala I), which established a new standard for admitting evidence of other crimes. Returned to Orange County for retrial, Alcala was again convicted and the death penalty re-imposed, which was affirmed on appeal. (See People v. Alcala (1992) 4 Cal.4th 742,755 [15 Cal.Rptr.2d 432, 842 P.2d 1192] (Alcala II).) This judgment was reversed by an order of a federal district court, which reversal was upheld by the Ninth Circuit Court of Appeals in Alcala v. Woodford (9th Cir. 2003)334 F.3d 862 (Alcala III) due to ineffective assistance of counsel. (Id. at pp. 865-866.) Again, Alcala returned to Orange County for retrial on the charges of kidnapping and murdering Robin Samsoe in 1979.
 In the interim, the California Legislature passed Penal Code section 790, subdivision (b) (section 790(b)),[1]
which provides that if "a defendant is charged with a special circumstance [murder charge], the jurisdiction for any charged murder, and for any crimes properly joinable with that murder, shall be in any county that has jurisdiction . . . for one or more of the murders charged in a single complaint or indictment as long as the charged murders are `connected together in their commission,' as that phrase is used in Section 954, and subject to a hearing in the jurisdiction where the prosecution is attempting to consolidate the charged murders. . . ." With this statute in mind, *Page 1498 the prosecution presented evidence to a grand jury which indicted Alcala for the separate murders of four young women in Los Angeles County in 1977, 1978, and 1979. The prosecution then brought the motion to consolidate the indictment with the case charging Alcala with the kidnapping and murder of Robin Samsoe under the authority of section 790(b).
 In addition to the legislative creation of 790(b), the 20-year period between the crimes and the latest trial also saw the passage of Proposition 115. That initiative included a provision, now found in section 954.1 (section 954.1), that "cases in which two or more different offenses of the same class of crimes . . . have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes . . . have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together. . . ."
 After briefing and argument from both parties, the court granted the motion to consolidate and refused any severance. Alcala petitions us to bar the lower court from proceeding on the consolidated case and to sever the Los Angeles murder counts from the Robin Samsoe charges. We grant his petition in part and deny it in part.
 FACTS Robin Samsoe Case The facts proving the Robin Samsoe case are taken from those laid out in Alcala II. On June 20, 1979, 12-year-old Robin Samsoe spent the afternoon with her girlfriend, Bridget Wilvert, along the cliffs overlooking the beach in Huntington Beach. A man approached them asking to take their pictures for what he represented to be a school contest. The girls posed for him until Jackelyn Young, Wilvert's neighbor, noticed the man's suspicious attention on the young girls and interrupted them. The man hurriedly picked up his equipment and left. The man was identified as Alcala.[2]
(Alcala II, supra, 4 Cal.4th at pp. 755-757.) *Page 1499 
 A few minutes later, Samsoe and Wilvert returned to Wilvert's home where Samsoe borrowed Wilvert's bike to ride to her beloved ballet class. She was never seen again. (Alcala II, supra,4 Cal.4th at pp. 755-756.)
 Dana Crappa was a seasonal worker for the United States Forestry Service stationed at Chantry Flats, an area near Sierra Madre. Later on the same day Samsoe disappeared, Crappa was driving in the remote region of those hills and came across a Datsun F10 parked on a turnout. There was a dark-haired man pushing or "`forcefully steering'" (Alcala II, supra,4 Cal.4th at p. 758) a blond-haired young lady towards a dry stream bed. Crappa did nothing about the sighting even though she thought it strange. The next day, she was again returning to her barracks and had the occasion to pass the same area. The same car was parked nearby the original site, and this time the man was leaning against a nearby rock. He appeared to have dirt or stains all down the front of him. She felt there was something wrong with this scenario, but again told no one and did nothing about it. (Id. at pp. 758-759.) Crappa tentatively identified Alcala as the man she saw.
 Five days after the original sighting, Crappa again returned to the site, this time to satisfy her curiosity about the scene. She discovered a mutilated body of a young girl whose head had been partially severed from the body and whose hands and feet had been severed. Surprisingly, she did not report this finding nor did she reveal it to anyone, feeling guilt over not having reported what she had seen five days earlier. It wasn't until July 2, 1979, that a colleague of Crappa's discovered some bones in the area and reported it to the authorities. By this time, however, wild animals had so disrupted the decomposed remains that it could not be determined what had caused the death or whether the person had been sexually assaulted. At this time, the skull was completely separated from the spine, and the front teeth were smashed in. A "Kane Kut" kitchen knife was found near the main portion of the remains; and less than a mile away, Samsoe's beach towel was discovered with blood on it of a type consistent with that drawn from the bone marrow of the remains. Her personalized tennis shoe was found, too, but that was the sole piece of clothing retrieved. (Alcala II, supra,4 Cal.4th at pp. 758-760.)
 In the interim, Wilvert assisted a police composite artist in drawing up a sketch of the man who took the girls' pictures. That composite sketch was distributed by the media on or about June 22. Alcala's parole officer saw the sketch and felt it was a match to Alcala, particularly in light of Alcala's aberrant sexual interest in young girls and his familiarity with the area in which the remains were found, which were matters known to the parole officer. (Alcala II,supra, 4 Cal.4th at p. 756.) *Page 1500 
 A search warrant was served on the home Alcala shared with his mother in Monterey Park. The police impounded a Datsun F10 parked at the home which was registered to Alcala, inside of which the officers found camera equipment and a briefcase containing a set of keys. Inside the home, they seized sets of Kane Kut kitchen knives and noticed — but failed to seize[3] — a receipt for a storage locker in Seattle, Washington. (Alcala II, supra,4 Cal.4th at pp. 756-761.)
 The storage locker was then searched pursuant to a warrant and the authorities made several interesting discoveries: (1) The keys from Alcala's briefcase opened both of the two locks put on the locker; (2) in one of the boxes of photographs inside the locker, they found slides taken of Lorraine Werts at the beach on the same day Robin Samsoe had disappeared; (3) several items of jewelry were found, including a pair of gold ball earrings often worn by Samsoe and which Samsoe's mother identified as her own, based on a modification she had made by using her nail clippers to alter the surface; and (4) the striations found on those earrings were consistent with marks made by those nail clippers in a test. (AlcalaII, supra, 4 Cal.4th at p. 761.)
 Alcala's girlfriend, Elizabeth Kelleher, testified that she saw Alcala on June 22, at which time he was sporting his usual long, curly hair. The next day, however, the composite sketch was exhibited throughout the area. On June 23, Alcala "straightened" his hair using a chemical solution and then cut his hair short on June 26. On July 8, he informed Kelleher that he was going to move from Southern California to Texas to start a photography business. However, he actually went to Seattle — not Texas — on July 11. It was at this time he obtained the storage locker. He returned to Monterey Park, informing Kelleher that he planned to leave for Texas permanently on July 24. On the other hand, he told another friend, Leslie Schneider, that he was leaving for Chicago. (Alcala II, supra, 4 Cal.4th at p. 760.)
 Alcala relied on an alibi defense, although not testifying himself.[4] He called various witnesses who testified he applied for a photographer's position *Page 1501 at Knott's Berry Farm on June 20. He also had a defense witness testify that the striations on the gold earrings were consistent with having been made with nail clippers provided by Alcala's mother. He also had a different friend testify that she saw him wear gold ball earrings, although another friend contradicted this assertion. Finally, a jail inmate, who developed an acquaintanceship with Alcala while he awaited his first trial, testified that Alcala told him that Samsoe had screamed, scratched and yelled during the ordeal. Alcala then reputedly described Samsoe's body in very salacious terms. (Alcala II, supra,4 Cal.4th at pp. 761-763.)
 The Four Los Angeles Murders Evidence concerning the four murders from Los Angeles County was presented to an Orange County grand jury which issued an indictment based on the following information:
 In July 1977, the body of Jill Barcomb was found on a remote dirt road, essentially nude.[5] She had been badly beaten about the head and face with a "substantial" size rock lying nearby. A pointed side of it was covered with blood. Her upper face had been crushed, and her front teeth had been fractured. She had a bloodied bite mark on the nipple of her right breast. She also had serious anal injuries with conspicuous bleeding from the anus. Finally, she had been strangled in three different ways: with a buckled belt, with knee-high hose and with one of the legs to the pants she had previously been wearing.
 Barcomb was a "tiny" woman, no more than five feet tall and weighing about 95 pounds. Swabs were taken from her genital region and preserved. Subsequently, the development of deoxyribonucleic acid (DNA) typing technique led to a comparison being made between the DNA in the sperm found in the swabs and that of Alcala. They "matched," with a random match occurring only once in 100 billion.
 In December 1977, Georgia Wixted was a young single woman, living alone and working as a nurse. The last anyone saw of her was in the early morning hours when she gave her girlfriend, Barbara Gale, a ride home. Gale *Page 1502 expected to see Wixted the next day at work. When she failed to appear, the police went to her Malibu apartment and found her lying dead on the floor of her bedroom. She had nylon hose wrapped around her neck several times and so tightly knotted that a furrow was carved into the cartilage of her neck. She died of strangulation and massive head injuries: Her skull had been bashed with a hammer lying nearby. Her face had also been hit, and her genitals were mutilated, possibly with the handle of the same hammer. Her purse's contents were strewn around the bathroom and there was evidence of forced entry: scuff marks along one window and a box placed beneath it to assist entry. The cabinet drawers throughout the place were open and their contents in disarray.
 Anal swabs were taken from the victim, and a palm print was lifted from the bed's brass railing. DNA analysis of the swabs' fluids matched that of Alcala, with a random match occurring only once in a trillion. The palm print was later compared with that of Alcala, and that likewise matched.
 In June of 1978, a young woman, Charlotte Lamb, was found brutally murdered in a laundry room of an apartment complex. She was nude, and had been strangled with a long shoelace from a sandal she had been wearing. Her head and face had been badly beaten with a heavy piece of wood lying nearby. The shoelace was used as a garrote, so forcefully tightened that the cartilage around her voicebox and thyroid was fractured. Her right breast was scraped and there were lacerations over her eye and to all of her genital area. She had pierced ears but was not found wearing any earrings. Swabs were taken from her vaginal area, which were later compared to the DNA sample provided by Alcala. The DNA found in the semen fluid on the swabs matched that of Alcala with a random match occurring once in 403 trillion persons.
 In June 1979, a few days before Samsoe disappeared, Jill Parenteau left work early to attend a baseball game. She failed to appear for work the next day. The police went to her apartment, discovering evidence of a forced entry and her body on the floor of her bedroom.[6] She was nude, and had been beaten severely about the face and head. She had deep wounds to her vaginal and rectal areas, and fingernail scratches on her breast. She had been strangled so brutally that there was a massive hemorrhage throughout the area of the thyroid, voicebox and epiglottis. *Page 1503 
 Swabs were taken of her genitals and her mouth. Only the oral swab revealed any seminal fluid and the only testing done on it was to define the serological characteristics of the contributor. However, it revealed that Alcala could not be excluded as having left the fluid, and the combination of serological factors was so rare that it would only be present in 3.5 percent of the population.
 Parenteau's girlfriend, Katharine Bryant, testified that she recognized Alcala. Bryant and Parenteau had gone "clubbing" one evening and had encountered him at a club less than a month before the murder. They had seen him and socialized with him at the club on more than one occasion.
 One last test was done on the other pieces of jewelry found in the cloth bag in Alcala's storage locker in Seattle. One earring — not related to the gold ball earrings recognized by Samsoe's mother — was in the shape of a rose and designed to be worn with pierced ears. DNA testing was done on it, revealing that fluids from Lamb were still present on the pierced earring although it had been taken from her ear more than 20 years before.
 DISCUSSION Consolidation of Murder Charges Under Section 790(b) The consolidation of the Robin Samsoe charges with the murders of Barcomb, Wixted, Lamb and Parenteau was based on the authority of section 790(b), according to the trial court's statement at the time of the order. Alcala contends the trial court erred in its conclusion and its rationale; the Orange County District Attorney responds the trial court properly ordered the joinder and did so employing the proper standard.
 Alcala argues that a review of an order consolidating charges or denying severance[7] is governed by the abuse of discretion standard. (Cf. Peoplev. *Page 1504 Valdez (2004) 32 Cal.4th 73, 119-120
[8 Cal.Rptr.3d 271, 82 P.3d 296] [burden on defendant to show clear prejudice from joint trial on review of denial of severance]; see also People v. Ochoa (1998) 19 Cal.4th 353, 408
[79 Cal.Rptr.2d 408, 966 P.2d 442] [granting of consolidation or denial of severance reviewed for abuse of discretion].) An abuse of discretion is that which "fall[s] `outside the bounds of reason.' [Citation.]" (Ochoa, supra, at p. 408.)
 Under section 790(b), all California murders — committed in any county — may be tried within a single county in which one of the murders occurred, providing there is a special circumstance allegation that multiple murders were committed pursuant to section 190.2, subdivision (a)(3), and that all the murders are "connected together in their commission" as that is defined under section 954.[8] That phrase is not limited to a single course of criminal conduct or the achievement of a single criminal objective. (4 Witkin Epstein, Cal. Criminal Law (3d ed. 2000) Pretrial Proceedings, § 208, pp. 412-13.) Rather, it is a broad concept encompassing all offenses having "`a common element of substantial importance in their commission, for the joinder prevents repetition of evidence and saves time and expense to the state as well as to the defendant.' [Citations.]" (Ibid.)
 Alcala disagrees, contending case law such asAlcala I and Williams v. Superior Court (1984)36 Cal.3d 441 [204 Cal.Rptr. 700, 683 P.2d 699] essentially eliminated such an expanded definition of connection by crafting a distinctly new basis for severance: mandatory cross-admissibility. Recent authority indicates otherwise: InPeople v. Mendoza (2000) 24 Cal.4th 130, at page 160 [99 Cal.Rptr.2d 485, 6 P.3d 150], the court held that "[o]ffenses `committed at different times and places against different victims are nevertheless "connected together in their commission" when they are, as here, linked by a "`common element of substantial importance.'" [Citations.]'" Such common elements can be proximity of time or place or even thecommon intent with which the same general type of offense is committed. In Mendoza, the court noted the common "`element of an intent to feloniously obtain property runs like a single thread through the various offenses. . . .'" (Ibid.; see also People v. Meneley (1972)29 Cal.App.3d 41, 51 *Page 1505 [105 Cal.Rptr. 432] [two crimes share common element when both involved young women, walking alone, who were assaulted and abducted].)
 Likewise here. The common element of an intent to brutally kill young females ties all the crimes together. This common element provides a reasonable and rational basis for the court to apply section 954.1 and consolidate the pleadings.
 Alcala concedes section 954 authorizes the prosecution to charge all the homicides — all offenses of the same class of crimes — in one proceeding in Orange County. However, he contends federal due process bars such an action and mandates a severance of the Los Angeles murders. He invokes both a four-part test for discretionary abuse (see People v. Bradford (1997) 15 Cal.4th 1229,1315 [65 Cal.Rptr.2d 145, 939 P.2d 259]) and the mandatory cross-admissibility concepts which preceded the passage of Proposition 115, positing he is entitled to all due process considerations in effect at the time of the commission of the offenses.
 1. Ex Post Facto Concerns Our first step in resolution of this complicated matter is to determine whether sections 790(b) and 954.1 may be applied, as the passage of those statutes postdated the commission of all of these offenses. Although not originally addressed by the parties, the issue was briefed upon our request.
 As declared in Tapia v. Superior Court
(1991) 53 Cal.3d 282 [279 Cal.Rptr. 592, 807 P.2d 434], certain provisions of Proposition 115 can be applied to defendants whose criminal charges occurred prior to its effective date, but other parts could not, due to the ex post facto guarantee. Employing its method of determining first the application of the "presumption of prospectivity" and then examining the definition of retrospective effect, Tapia divided the different aspects of Proposition 115 into four groups: "(A) provisions which change[d] the legal consequences of criminal behavior to the detriment of defendants; (B) provisions which address[ed] the conduct of trials; (C) provisions which clearly benefit[ted] defendants; and (D) a single provision which codifie[d] existing law." (53 Cal.3d at p. 297.) Those parts of the initiative that changed the legal consequences of criminal behavior could not be applied to offenses committed before its effective date. (Ibid.) The aspects that fell under the three other groups, however, could be applied to cases in which the crimes were committed before the date of its *Page 1506 passage. Because section 954.1 addressed "the conduct of trials," it could be applied to offenses committed before the law's effective date. (Id. at pp. 299-300.)
 As section 790(b) likewise addresses only "the conduct of trials," it may also be applied even though the offense may have occurred prior to its passage. Statutes of this sort do not implicate "the definition of, punishment of, and defenses to crimes," thus eliminating any possible ex post facto concern. (1 Witkin Epstein, supra, Introduction to Crimes, § 12, p. 28.) Nonetheless, as Tapia argued — as does Alcala — such laws may appear to have a "retrospective" effect, necessitating a review for a potential ex post facto violation. (Tapia v. Superior Court,supra, 53 Cal.3d at pp. 299-300.)
 Thus, we must examine the second prong of theTapia test as it applies to Alcala because these statutes, by permitting the consolidation of charges and eliminating the mandatory cross-admissibility of evidence, may arguably result in an "`alter[ation of] the legal rules of evidence, and [thereby] receive? less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender.'" (Carmellv. Texas (2000) 529 U.S. 513, 522 [146 L.Ed.2d 577, 120 S.Ct. 1620] [quoting Calder v. Bull (1798) 3 U.S. 386,390 [1 L.Ed. 648, 3 Dall. 386]], italics omitted.)
 There is no dispute that section 954.1 lacks any explicit provision for retroactivity. Because of this silence, the presumption of prospectivity applies. We note that the California Supreme Court in some recent cases has exercised extreme caution, approaching this issue in dicta by applying the law as it existed at the time of the trial. In each instance, however, the consolidation, severance or cross-admissibility motion was resolved in the trial courtbefore passage of Proposition 115. For this reason, the provisions of section 954.1 could not be applied on appellate review. (See, e.g., People v. Gutierrez,supra, 28 Cal.4th at p. 1120, fn. 5; People v.Catlin (2001) 26 Cal.4th 81, 111, fn. 3 [109 Cal.Rptr.2d 31, 26 P.3d 357]; People v. Cunningham (2001)25 Cal.4th 926, 984, fn.7 [108 Cal.Rptr.2d 291, 25 P.3d 519];People v. Bradford, supra, 15 Cal.4th at p. 1314, fn. 13.) That situation is not present here: Both sections 790(b) and 954.1 became effective before Alcala III was issued and thus were discussed in the trial court below.
 The Tapia approach has been applied consistently with other, similar provisions. For instance, in juvenile delinquency proceedings, changes in the laws concerning the type and timing of charging documents were applied, notwithstanding that the crimes were committed before the particular law's passage. "`Even though applied to the prosecution of a crime committed *Page 1507 before the law's effective date, a law addressingthe conduct of trials still addresses conduct in the future. . . . Such a statute "`is not made retroactive merely because it draws upon facts existing prior to its enactment. . . . [Instead, t]he effect of such statutes is actually prospective in nature since they relate to the procedure to be followedin the future.' "`[Citations.]'" (John L. v.SuperiorCourt (2004) 33 Cal.4th 158, 169-171
[14 Cal.Rptr.3d 261, 91 P.3d 205], original italics.)
 Both sections 790(b) and 954.1 address the conduct of trials. (See Tapia v. Superior Court, supra,53 Cal.3d at p. 299.) Laws that change the rules of evidentiaryadmission or competence — as distinct from the quantum of evidence to convict — do not violate the ex post facto guarantee. (See Carmell v. Texas, supra,529 U.S. at pp. 542-547.) It is only when a law changes the "quantum of evidence required to convict an offender" (id. at pp. 532-533) that the evidentiary modification triggers constitutional concern.
 For example, in Carmell, the defendant engaged in a four-year pattern of molesting his teenaged stepdaughter. Before he was charged with the criminal offenses, the law was amended that had formerly required a victim to report a sexual offense within six months of its occurrence or the state had to provide corroboration of the incident. (Carmell v. Texas, supra, 529 U.S. at pp. 516-518.) Carmell was tried and convicted of certain charges solely on his stepdaughter's testimony. The law's revision was deemed a violation of ex post facto protection because the evidentiary change affected the "minimum quantum of evidence necessary to sustain a conviction." (Id. at pp. 517-518.)Carmell explained that the "issue of the admissibility of evidence is simply different from the question whether the properly admitted evidence is sufficient to convict the defendant. Evidence admissibility rules do not go to the general issue of guilt, nor to whether a conviction, as a matter of law, may be sustained. . . . Sufficiency of the evidence rules (by definition) do just that — they inform us whether the evidence introduced is sufficient to convict as a matter of law (which is not to say the jury must convict, but only that, as a matter of law, the case may be submitted to the jury and the jury may convict)." (Id. at pp. 546-547.)
 Examining the situation before us, sections 790(b) and 954.1 on their face address only the manner in which a trial is conducted. Indirectly, it affects some general evidentiary matters, but it does not establish orchange the minimum quantum of evidence to convict. Thus, they do not trigger any ex post facto concern. The trial court, therefore, had the statutory authority to consolidate the offenses under section 790(b), irrespective of the evidentiary provisions of section 954.1. *Page 1508 
 2. Effect of Cross-admissibility Changes Although the trial court correctly consolidated the pleadings, we must continue to inquire whether severance was mandated by due process concerns. Alcala argues that, at the time these offenses were committed, due process mandated severance if the defendant showed he would be prejudiced by the joint trial. (Walker v. Superior Court (1974)37 Cal.App.3d 938, 940-942 [112 Cal.Rptr. 767].) Such a showing was met when none of the evidence of one charge could be relevant or admissible in the other and evidence of a prior conviction — potentially prejudicial information — was required as proof of one of those charges. (Id. at pp. 941-942 fn. 1.) In other words, unless the evidence of one charge was cross-admissible in separate trials for all other charges, Alcala argues that a trial court in 1979 would have had to sever each and every crime. Thus, he argues he is entitled to a severance now: His due process rights cannot be negatively modified simply because he has not been brought to trial in the last 20 years.
 Initially, we note that we have already established that changes in the laws concerning the conduct of trials donot trigger ex post facto concerns. Nonetheless, we review Alcala's particularized arguments to see if the application of section 954.1 to his situation prejudiced his right to a fair trial.
 In Aydelott v. Superior Court (1970)7 Cal.App.3d 718 [86 Cal.Rptr. 713], two counts of contributing to the delinquency of a minor and two counts of lewd acts on those minors could not constitutionally be paired with a count of illegally prescribing a narcotic to another person because thepotential prejudice was shown adequately to mandate severance of the narcotic count. (Id. at pp. 722-724.) Although the counts of contributing to delinquency were merely misdemeanors, they were properly charged with the serious counts of lewd acts on minors because "common elements of substantial importance underlying [all four counts] were the alleged circumstances that petitioner's home was used by him to commit [all four] crimes . . . and, as to each such count, a male juvenile was the victim." (Id. at pp. 722-723.) However, "no common element, characteristic, or attribute connects [the prescription] count . . . with any of the other counts." (Id. at p. 724.) Thus, the court did not abuse its discretion in ordering the joint trial on the four counts, but abuse was shown in its denial of severance of the prescription count. (Ibid.)
 In another case, however, no prejudice was shown by the joinder of one robbery when its supporting evidence "was much stronger than that supporting the other" count of robbery, even though the defendant feared "a `spilling over' from the former" would prejudice him. (People v. Fulton (1980)109 Cal.App.3d 777, 782 [167 Cal.Rptr. 436].) The court noted that evidence of the perpetrator's identity shown by the one would logically and permissibly *Page 1509 be used to prove the same person's guilt on the other. (Ibid.) Such was deemed appropriate because the two offenses shared certain characteristics: The first incident involved a daytime robbery of a couple in an apartment. It was committed by two armed men, one of whom was identified as Fulton. The second incident involved a daytime residential robbery of a man and his children's babysitter in the man's residence. It was likewise committed by two armed males. Those circumstances — and those circumstances alone — were held sufficient to dispel any claim of prejudice by their joint trial, irrespective of decided dissimilarities between the two incidents. (Ibid.)
 Alcala argues that we should review the trial court's ruling, but apply the law on the subject as it was at the time of the offenses. He refers us to Williams v.Superior Court, supra, 36 Cal.3d at page 452
(citing Coleman v. Superior Court (1981)116 Cal.App.3d 129, 137-140 [172 Cal.Rptr. 86]). However, we observe that this was not the test for prejudice employed in 1979 when the crimes were committed.
 The test in effect during 1977-1979 to test potential prejudice of joined offenses was that enunciated in People v. Matson (1974) 13 Cal.3d 35 at pages 39-41 [117 Cal.Rptr. 664, 528 P.2d 752]. InMatson, it was held that if the grounds for joinder were met — such as the charges were shown to share a common element of substantial importance — severance waspermitted if prejudice from a denial of that severance was clearly shown. Matson noted that "`[w]here the consolidation meets the test of joinder,' . . . `the difficulty of showing prejudice from denial of severanceis so great that the courts almost invariably reject the claim of abuse of discretion.' [Citations.]" (Id.
at p. 39, italics added.) Matson alleged that the prosecution had paired a rape charge with a burglary charge, which had as its sole dispute the defendant's intent at the moment of entry. In contrast, there was no conflict as to the evidence proving the intent necessary for the rape charge; Matson merely argued he was not the perpetrator. Thus, a rape count with weak evidence of identification was paired with a burglary count where identity was undeniable but the evidentiary sufficiency to prove intent was in dispute. (Ibid.)
 The court accepted that "doubts over the rapist's identity may have been dispelled by evidence that defendant used the same modus operandi in the burglary, just as doubts over defendant's intent in entering [the victim's] apartment may have been dispelled by evidence that he raped [the other victim]." (People v. Matson, supra, 13 Cal.3d at p. 40.) Nonetheless, the evidence of each was properly admitted in a joint trial because all the evidence was admissible under Evidence Code section 1101, subdivision (b): Evidence of "other crimes" would have been admissible to prove identity and intent anyway. (Ibid.) The court noted that in both the rape and burglary counts, women were accosted while loading or unloading their cars near their *Page 1510 apartments. (13 Cal.3d at p. 39.) One woman was raped but the other was not. Nonetheless, those facts alone were sufficient for the court to find a common modus operandi, making each crime's facts admissible under Evidence Code section 1101, subdivision (b), in the trial of the other. (13 Cal.3d at pp. 40-41.)
 Finally, the Matson court noted that cross-admissibility was merely one way of testing for prejudice. The trial court could have still denied severance without any analysis of cross-admissibility because "the judge's discretion in refusing severance is broader than his discretion in admitting evidence of uncharged offenses. `The requirements of similarity that apply to the admission of evidence ofuncharged offenses [citation] are not applicable when all offenses are charged.' [Citation.] In both cases the probative value of considering one alleged offense in light of another must be weighed against the prejudicial effect, but additional factors favor joinder. . . ." (People v. Matson,supra, 13 Cal.3d at p. 41, original italics.)
 Thus, we must reject Alcala's argument that the law at the time of the commission of the crimes must control the present case's admission of evidence and consolidation of offenses. Not only is the present law the appropriate one for issues concerning how trials are conducted, but it is not less advantageous to his position than the state of the law in 1979. We continue to review the trial court's ruling, however, to determine if due process requires severance of any of the counts.
 In this case, all five victims were young, White, thin, single females who were brutally murdered, with two of the victims — Parenteau and Robin Samsoe — having met their deaths within a week of each other. All of them had evidence of extreme neck ligature: Robin Samsoe had her head partially severed, as seen by Crappa a few days after the murder while Wixted's neck cartilage was actually "furrowed" by garroting and Lamb's neck cartilage had been fractured with a garrote. Both Robin Samsoe and Barcomb had their teeth smashed in while the other three women suffered severe facial injuries due to blunt force trauma. In the Parenteau case, her jewelry box had been opened by the culprit and rifled. In the Lamb case, an earring had been removed from the victim — and later found in Alcala's souvenir pouch — just as an earring had allegedly been removed from Robin Samsoe and kept as a memento in Alcala's pouch alongside Lamb's earring.
 Alcala says one cannot group murders of sexually assaulted women with a murder of a 12-year-old girl. Moreover, he contends, Samsoe's body was so disturbed and decomposed that her cause of death could not be determined, thus eliminating any inference that she had died of blunt force trauma or strangulation or suffered any sexual assault. As the other fourwomen had *Page 1511 been violently sexually abused, and there was no evidence of sexual assault in Samsoe's case, this dissimilarity alone should bar the admission of the evidence proving the four Los Angeles cases in the Robin Samsoe trial, he contends.
 A single dissimilarity should not be the sine qua non of exclusion under Evidence Code section 1101, subdivision (b) or severance under section 954. (See People v.Thornton (1974) 11 Cal.3d 738, 758 [114 Cal.Rptr. 467,523 P.2d 267] ["Probative value is not significantly diminished by the presence of certain marks of dissimilarity. . . ."].) We note that a single dissimilarity between offenses has been specifically rejected as the test for admission of evidence under Evidence Code section 1108.[9] (See People v.Isom (2006) 145 Cal.App.4th 1371, 1381-1383
[52 Cal.Rptr.3d 336].) However, that holding rested on the distinct differences between an analysis under section 1108 and the comparison required for admission pursuant to Evidence Code section 1101, subdivision (b), which, Alcala argues, is controlling here. (People v. Isom, supra, at pp. 1382-1383.) We do not suggest the legal issue in Isom is analogous to that here; we merely note that the trial court's factual finding was upheld that a "sexually mature" 15-year-old was notdissimilar to the other victims in the case, who were 12 and 10.
 Alcala presses forward, arguing that no judicial efficiency is accomplished by joining these unrelated crimes, necessitating long drives for prosecution witnesses and the general inconvenience to defense witnesses. But witnesses are not the only ones for whom the laws of joinder and consolidation benefit: As Matson noted, the defendant is benefited by a single prompt trial of all issues. And as the legislative history of section 790(b) notes, the trials of notorious serial killers "are usually circumstantial in nature and evidence from one prosecution is invariably admitted in the guilt or penalty phase of the other prosecution[,] resulting in a never ending series of appearances by citizens unfortunate enough to be witnesses." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 469 (1997-1998 Reg. See.), as amended May 5, 1997, p. 2, italics added.) Thus, it is advantageous for both the witnesses and the defendant to have a single trial in which all the different murders are proved in one proceeding,[10] because the evidence of one case will inevitably be admitted in the penalty phase of the others. *Page 1512 
 Under Bradford, Mendoza, Gutierrez,Catlin, and Cunningham, the factors to be considered in a review of a consolidation are: "(1) [T]he cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (People v. Mendoza, supra, 24 Cal.4th at p. 161.) On review, we must limit our examination to the evidence available to the trial court at the time of the severance motion, bearing in mind that Alcala bore the burden of proving "`"a clear showing of prejudice."'"(People v. Ochoa, supra,19 Cal.4th at p. 409; see also Frank v. Superior Court
(1989) 48 Cal.3d 632, 636 [257 Cal.Rptr. 550,770 P.2d 1119].)
 Full cross-admissibility is not the sine qua non of joinder, just as a single point of dissimilarity should notmandate severance per se. However, if the evidence of one case is admissible in another case, any potential for prejudice is dispelled. (See People v. Mendoza,supra, 24 Cal.4th at p. 161.) For this reason, the parties are most divergent in their positions on this point. Alcala argues that under People v. Balcom (1994) 7 Cal.4th 414
[27 Cal.Rptr.2d 666, 867 P.2d 777] and People v. Ewoldt
(1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757], evidence from none of the Los Angeles cases could be used in any way in the Robin Samsoe murder case. He argues that as to the Robin Samsoe case, intent is not and cannot be the issue;[11]
only the identity of the perpetrator is relevant. Thus, he concludes, the degree of similarity between the Samsoe case and any of the Los Angeles cases must be of the very highest before admission is warranted under Evidence Code section 1101, subdivision (b).
 Alcala emphasizes that all of the Los Angeles cases dealt with brutal sex crimes perpetrated on adult women in which they were tortured through sexual abuse. Nothing of that nature was present in the Samsoe case, he argues, which dealt with the kidnapping and "simple" murder of a little girl. This clear deviation from the other cases mandates severance, he argues. He *Page 1513 also notes that the four Los Angeles cases are very strong cases in which DNA evidence links him inextricably to the crimes,[12] and there is nothing that links him to the Samsoe case but the very weak circumstance that eyewitnesses tentatively identified him walking and talking with her earlier in the afternoon of her disappearance. Finally, he crowns his position with the point that he faces the special circumstance allegation of multiple murders by the consolidation of all the charges.
 Alcala overlooks the impact of section 790(b), and consequently, the murders need only be "connected together in their commission," as that is used in section 954. Moreover, the burden is on the party seeking severance "`"`to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'"'" (Peoplev. Gutierrez, supra, 28 Cal.4th at p. 1120.) We review the evidence, comparing and contrasting the details, with great care, as severance must be ordered "if the joinder of the . . . charges `"actually resulted in `gross unfairness' amounting to a denial of due process."' [Citations.]" (People v.Valdez (2004) 32 Cal.4th 73, 120 [8 Cal.Rptr.3d 271,82 P.3d 296].)
 Under section 954, the offenses need only share some "element of substantial importance" to be connected in their commission. (People v. Valdez, supra,32 Cal.4th at p. 119.) That element was met when Alcala kept a "trophy bag" of jewelry items taken from his victims: Earrings from Robin Samsoe were found in the same bag as an earring from Lamb, thus connoting both were his "victims"; and Parenteau's jewelry box had been rifled. The importance of that connection was heightened by an entry in a book written by Alcala while imprisoned, expressing his ownership of all the jewelry items found in the pouch.[13] It also highlights how the facts of the Lamb case would inevitably become relevant in the Samsoe trial: To contradict Alcala's denial that he possessed the "souvenirs" from the crimes and had a habit of keeping such souvenirs from sadistic murders.
 Irrespective of its status as a common element of substantial importance, the earring held other evidentiary potential. As already noted, cross-admissibility tests emerge from the authority in Evidence Code section 1101, subdivision (b), to admit or exclude evidence of other uncharged crimes in a *Page 1514 trial for a charged crime. Both Ewoldt
and Balcom discuss the highly sensitive nature of such evidence (People v. Ewoldt, supra,7 Cal.4th at p. 404; People v. Balcom, supra, 7 Cal.4th at p. 422), particularly when it need only be proved by a preponderance of the evidence before the trier of fact can use it for one of the enumerated purposes. (See Carpenter II, supra,15 Cal.4th at p. 382.)
 Before the facts relevant to one charge can be considered in relation to the proof of another charge, those facts must be shown to be "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, . . .) other than his or her disposition to commit such an act." (Evid. Code, §1101, subd. (b).) The district attorney asserts that the evidence of the Los Angeles crimes is relevant to prove motive or common plan. Alcala responds that those factors are not pertinent in the Samsoe case as he does not contest that the crime occurred or that the perpetrator did so with the specific intent required for the special circumstances as alleged. He only contests the identity of the perpetrator. If evidence of another crime is used to prove his identity, that evidence must show the other incident to be almost identical with the charged offense, reflecting a signature method of the perpetrator, or both incidents must carry such unique characteristics as to be a form of identification. (See People v. Ewoldt, supra,7 Cal.4th at pp. 402-105.) Alcala contends none of the Los Angeles cases are even similar to the Robin Samsoe case, much less identical, and that their dissimilarities are numerous.
 Dissimilarity is not necessarily the issue; it is the marks of similarity that are most relevant. We do not "look for characteristics not . . . shared by a particular offense and thereby disqualify that offense from consideration. . . ." (People v. Kraft (2000) 23 Cal.4th 978, 1061
[99 Cal.Rptr.2d 1, 5 P.3d 68] [pinpoint instructions demanding similarity and no dissimilarity for offenses to be of the same modus operandi properly rejected].) It is a mark of commonality that we note in our "task of determining the degree of distinctiveness and the number of such circumstances necessary to establish defendant's identity as the perpetrator. . . ." (Id. at p. 1062.)
 More importantly, identicality is not required to prove motive, as motive is more akin to intent than it is to identity. (See 1 Witkin, Cal. Evidence (4th ed. 2000) Circumstantial Evidence, § 87, pp. 426-127;[14] cf.People v. Ewoldt, supra, 7 Cal.4th at p. 402 [least degree of similarity required for admission to prove intent].) Although the identity of Robin Samsoe's murderer is the *Page 1515 ultimate issue at the trial for that offense, it is not the sole one. Clearly, the prosecution intends to prove the perpetrator's identity circumstantially, a method that is no less valuable and potentially as strong as proof via direct evidence. (See People v. Mendoza, supra,24 Cal.4th at p. 162.) And another crime that indicates a defendant's motive, consistent with the alleged motive in the charged crime, can be admitted to clarify that point, irrespective of defendant'sprimary dispute with the prosecution's case. (See, e.g., People v. Butler (2005) 127 Cal.App.4th 49, 59-61
[25 Cal.Rptr.3d 154] [evidence of fight at party in which defendant was chased by group including later victim relevant to prove defendant's motive in an otherwise unprovoked attack on victim two weeks later]; see also People v. Gallego
(1990) 52 Cal.3d 115, 171 [276 Cal.Rptr. 679, 802 P.2d 169] [although crimes insufficiently similar to admit to prove identity, properly admitted to establish intent].) At the least, the Lamb murder clarifies Alcala's motive for changing his testimony: He testified and wrote a book espousing his personal ownership of all the jewelry found in the pouch to refute the prosecution's evidence that the gold ball earring belonged to Samsoe and her mother. Due to the newly developed connection of the rose earring to Lamb, he will be forced to deny his prior testimony and statements. Motive for changed testimony also permits evidence of other crimes to prove the point. (See, e.g., People v. Hawkins (1995)10 Cal.4th 920, 950-952 [42 Cal.Rptr.2d 636, 897 P.2d 574] [evidence that Hawkins stabbed his brother relevant to explain brother's changed testimony, by supporting brother's expressed fear of Hawkins and that such fear was warranted].)
 Certain similarities between at least three of the five cases are sufficient to prove motive. In the Parenteau, Lamb and Samsoe cases, all the victims were young, trim, White females. Moreover, Parenteau was a cyclist and Samsoe was a ballet dancer, both very lean and athletic. All three victims were taken away or isolated from all other persons, and all were brutalized. Although the actual cause of death was indiscernible in the Samsoe case, all three victims had received severe blunt force trauma injuries to the face and head; Samsoe's severed head showed that her teeth had been bashed. In Lamb's case, an earring had been removed from the victim; in Parenteau's case, her jewelry case had been ransacked, whereas Robin Samsoe had her earring stolen from her earlobe. Earrings from Lamb and Samsoe were found together in Alcala's possession in a locker that he had attempted to hide from the authorities. The Parenteau and Samsoe murders occurred within a week of each other, and all three occurred in adjacent counties. All the victims received severely brutal injuries to the neck and throat, with Samsoe's neck having been partially severed and Lamb's throat cartilage having been fractured. Finally, both Parenteau and Samsoe, while in the company of girlfriends, had met and socialized with Alcala prior to their respective deaths. *Page 1516 
 Alcala characterizes the circumstantial evidence connecting him to the Samsoe case as "weak," in contrast with the allegedly "strong" identification evidence in three of the Los Angeles cases: DNA evidence connected him to the Lamb, Wixted and Barcomb crimes. However, even DNA evidence can be less than convincing in all cases. (See Lee and Tirnady, Blood Evidence: How DNA is Revolutionizing the Way We Solve Crimes (2003), pp. 1-338 [even though DNA evidence was overwhelming, O.J. Simpson was acquitted after lawyers cast doubt on the investigation and scientists].) Indeed, DNA evidence is circumstantial evidence, albeit highly convincing in mostcases.
 In contrast to the forensic evidence linking him to the Los Angeles cases, the prosecution case included Alcala's highly convincing confession to a fellow jail inmate. Alcala reputedly told him that Samsoe had fought, screamed and yelled to get away from him, and that he had committed the Samsoe crimes. Such self-incriminatory revelations can go far in establishing the identity of the perpetrator. (See, e.g.,People v. Mussel white (1998) 17 Cal.4th 1216, 1245
[74 Cal.Rptr.2d 212, 954 P.2d 475] [confession to murder equally powerful as eyewitness identification by assault victim].)
 Even if we were to assume that all five cases are not cross-admissible (see, e.g., Peoplev. Ochoa (2001) 26 Cal.4th 398, 424 [110 Cal.Rptr.2d 324,28 P.3d 78]) in the guilt phase,[15] the trial court's order as to the Parenteau and Lamb cases must be affirmed because the remaining three factors listed in Mendoza
clearly support the joint trial: Those two Los Angeles cases are no more inflammatory or inherently prejudicial than the highly publicized kidnapping and brutal murder of a preteen girl whose remains were so destroyed that the specifics of her death were indiscernible. Finally, Alcala argues the evidence of the Robin Samsoe case is weak, but that characterization is highly debatable. He contends it is weak because his conviction has been reversed twice for two different errors, errors which would not have compelled reversal unless the prosecution's case was so weak that conviction would not have been obtained but for those errors.
 Notwithstanding Alcala's lament, the prosecution's case in the Samsoe murder appears to be growing in strength and persuasiveness. With the newly revealed evidence corroborating that the gold ball earring was Robin Samsoe's, and, inferably, that Alcala kept it as a souvenir along with Lamb's earring, the *Page 1517 case cannot be honestly characterized as a weak one. The multiple witnesses who identified him as the man with Samsoe and Wilvert earlier in the day, Crappa's tentative identification of him as the man pushing Samsoe into the wilderness, Alcala's taking and keeping her earring,and his confession to a fellow inmate, combine to make a seemingly strong case. (See, e.g., People v. Carter
(2005) 36 Cal.4th 1114, 1155 [32 Cal.Rptr.3d 759, 117 P.3d 476] [marks of similarity were that all three separate victims were strangled and items belonging to them later found in defendant's possession].)
 Finally, the joinder of the Parenteau and Lamb cases with that of Samsoe does not change a noncapital case into one with a capital penalty: Alcala already faces the death penalty irrespective of the joinder of any of the Los Angeles crimes. (Cf. Williams v. Superior Court, supra,36 Cal.3d at p. 454 ["it is the joinder itself which gives rise to the special circumstances allegation of multiple murder. . . ."].) Those two additional murders merely trigger application of another special circumstance, not the death penalty itself which has always been present due to the nature of the Robin Samsoe crime.
 In summation, Alcala argues that a fair trial is absolutely impossible if he is forced to face the "glass mountain" of evidence that all five murder cases would build. That point is hard to deny. The Barcomb and Wixted crimes do not share all the marks of similarity as do the Parenteau, Lamb and Samsoe murders; and they possess the DNA evidence Alcala argues is unfairly insurmountable. We accord weight to the argument that, instead of reviewing the facts of each murder carefullyand individually, the trial court treated the issue as one of severing all four Los Angeles cases from the Samsoe murder, or severing none of them. Based on the plethora of case authority advancing a thorough and sensitive review of each case individually, we have followed that form. The record clearly supports the trial court's decision as to the Parenteau and Lamb cases. We find that it fails to do the same regarding the charges involving Wixted and Barcomb. In light of the monumental task Alcala would face in refuting all the evidence in the Wixted and Barcomb cases which bear far less similarity with the Samsoe facts and which might combine in a fashion potentially unfair,[16] we hold the trial court erred in properly exercising its discretion when it failed to individualize its analysis as to each of those two murders. *Page 1518 
 DISPOSITION Alcala's petition is denied as it regards the consolidated pleadings of the Samsoe, Parenteau and Lamb cases. It is granted as it relates to the Wixted and Barcomb counts. The superior court is ordered to sever those latter two cases from the consolidated cases charging the murders and accompanying charges involving Samsoe, Parenteau and Lamb. The order to show cause, having served its purpose, is discharged.
 Rylaarsdam, J., and Ikola, J., concurred.
[1] All further statutory references are to the Penal Code unless otherwise stated.
[2] Several other young girls at the beach were approached by Alcala for pictures, either on that day or the next. In each case, someone was able to identify Alcala as the man taking photographs of young girls in bikinis. One young lady, Lorraine Werts, in company with her girlfriend, Patty Elmendorf, was on a beach adjacent to that occupied by Samsoe and Wilvert on the same day Robin disappeared. Alcala took several pictures of her in her bikini, and those pictures were found in Alcala's storage locker in Seattle. Alcala was also identified by Richard Sillett, a survey-party chief for the Huntington Beach recreational area. He remembered Alcala because he was carrying a 35 millimeter camera with a telephoto lens, an item of particular interest to Sillett.
[3] When the police returned to the Monterey Park home the next day, the receipt was nowhere to be found. Alcala's sister spoke with Alcala on the phone immediately after his arrest, went to the home and got the receipt, giving it to his mother. The receipt could not be found thereafter. (Alcala II, supra, 4 Cal.4th at p. 761, fn. 7.)
[4] Although he did not testify in theguilt phase of the second trial, Alcala testified as to this alibi in the penalty phase. (Alcala II,supra, 4 Cal.4th at p. 766.) He also admitted molesting a child in 1972 — and serving time in prison for it — and assaulting Tali S., one of three child molestation victims the prosecution presented in the penalty phase to prove he committed other, uncharged crimes. He likewise admitted possessing child pornography, which resulted in his spending more time in custody, having violated his parole. He also admitted he raped and beat another 15-year-old girl, Monique H. Nonetheless, he appealed to the jury to send him to prison for life, arguing that he was "absolutely harmless" away from children. (Id. at pp. 766-767.)
[5] The only clothing on the body was a sweater and top which were pulled up around the shoulders. The body itself was entirely exposed.
[6] The Burbank Police Department investigator who arrived on the scene described Parenteau's apartment as very neat and clean, sparsely furnished but having her bicycle directly inside the front door, which was "unusual" because everything else was so neatly closed away. The perpetrator had entered the apartment by removing glass louvers in a side window and then slicing through the screen.
[7] Some decisions concerning the charging site of the crime are deemed that of jurisdiction, which is a question of fact and for which the prosecution has the burden of proving by a preponderance of the evidence. "On review, a trial court's determination of territorial jurisdiction will be upheld as long as there is `some evidence' to support its holding. [Citations.]" (People v. Gutierrez (2002)28 Cal.4th 1083, 1117 [124 Cal.Rptr.2d 373, 52 P.3d 572].) However, the order of a court either consolidating or severing counts within a pleading are held to be procedural in nature, not jurisdictional. (See In re Pearson (1947)30 Cal.2d 871, 874 [186 P.2d 401].)
[8] Section 954 provides, in pertinent part, that an "accusatory pleading may charge two or more different offenses connected together in their commission, . . . and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. . . ."
[9] Evidence Code section 1108, subdivision (a) provides that "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to Section 352" and the defendant is presently "accused of a sexual offense."
[10] As an example, see People v.Carpenter (1999) 21 Cal.4th 1016, at pages 1038-1039 [90 Cal.Rptr.2d 607, 988 P.2d 531] (Carpenter III), in which a serial killer argued in his third capital appeal that he was denied procedural and constitutional rights because all murder charges throughout the state were not joined in a single trial. Instead, he faced prosecutions in two separate counties for multiple murders occurring in each, which inevitably led to duplication of testimony. (Id.
at p. 1039.) He contended he had been denied due process by the successive prosecutions. (Ibid.) This argument was rejected, as the court noted Carpenter had originally complained in his second capital appeal that severance of two murder charges in Santa Cruz County should have been granted. The Supreme Court had rejected that argument. (See People v.Carpenter (1997) 15 Cal.4th 312, 361-362 [63 Cal.Rptr.2d 1,935 P.2d 708] (Carpenter II).)
[11] Alcala characterizes a case of intent as one in which the defendant concedes he committed the criminal act but disputes he had the requisite mental state for the offense. (See People v. Ewoldt, supra,7 Cal.4th at p. 394, fn. 2.)
[12] The record reflects DNA evidence is present in three of the Los Angeles cases, but not all four. The Parenteau murder had serologicial evidence connecting Alcala to the crime, but not DNA evidence.
[13] This evidence contradicted his mother's testimony that the gold ball earring was hers — not either Robin Samsoe's or her mother's — and that she had modified it with her own nail clippers. Alcala's mother brought this up in the first trial, thus contradicting Robin Samsoe's mother's earlier testimony that the earring was one Robin often borrowed from her, and the prosecution's expert who opined the Samsoe nail clippers were consistent with the striations on the earring.
[14] "Most of the exceptions specified in [Evidence Code section] 1101(b) — `motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident' — can be lumped together in three categories: intent, common design or plan, and identity." (1 Witkin, Cal. Evidence, supra, § 87, pp. 426-127.
[15] At the previous penalty phase, Alcala testified that, as long as he was imprisoned away from children, he was "absolutely harmless." (See fn. 4, ante) Evidence of multiple brutal murders of adult women would inevitably be used to refute such a statement, and would thus become relevant in the penalty phase.
[16] Joinder of multiple cases which are arguably weak in an effort to overcome the evidentiary difficulties in one of the case has always been discouraged. (See generally Williams v. Superior Court, supra,36 Cal.3d at pp. 452-454; see also People v. Smallwood
(1986) 42 Cal.3d 415, 427-433 [228 Cal.Rptr. 913,722 P.2d 197].)
 *Page 1